### STATE OF CONNECTICUT *v.* JOHN SLATER
### (SC 17794)

Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued October 19, 2007—officially released January 22, 2008

*William B. Westcott*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence Mariani*, senior assistant state's attorney, for the appellee (state).

KATZ, J. The defendant, John Slater, appeals from the judgment of the Appellate Court, affirming the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1)[1] and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B).[2] *State* v. *Slater*, 98 Conn. App. 288, 908 A.2d 1097 (2006). The Appellate Court concluded that the trial court properly had admitted certain out-of-court statements by the victim of an alleged sexual assault, who had died prior to trial: (1) to two men on the street soon after the assault that she had been "raped by a black man with a big knife"; and (2) to a physician and a nurse regarding certain details of the assault. Id., 290. The Appellate Court further concluded that the trial court's refusal to deliver the defendant's proposed jury instruction as to the potential for improper motive and bias of a jailhouse informant who had testified against the defendant was harmless error. Id., 310–11. In his certified appeal to this court, the defendant claims that the Appellate Court improperly determined: (1) that the admission of the victim's statements to the men on the street and to the medical personnel did not violate his rights under the confrontation clause of the sixth amendment to the federal constitution[3] according to

---

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ."

[3] The sixth amendment to the federal constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

the test articulated by the United States Supreme Court in *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); and (2) that the failure to deliver the proposed instruction was harmless error. We affirm the Appellate Court's judgment.

The jury reasonably could have found the following facts. On May 6, 1997, in the city of Waterbury, the defendant forced the victim into a van with a knife, which he used to poke her in the hand. The defendant first forced the victim to perform oral sex on him. The defendant then had vaginal intercourse with the victim. Shortly thereafter, Barry Kilcran and Gary Jones, who were at Kilcran's house at 129 Warner Street in Waterbury, heard the victim coming down the street screaming and crying that someone had tried to rape her. The victim approached the two men in a disoriented and hysterical state and told them that "a black male with a big knife" had raped her. Kilcran and Jones brought the victim inside the house and telephoned the police.

The police thereafter transported the victim to the hospital, where she was admitted to the emergency room. Catherine Judd, a registered nurse, found the victim trying to hide in a corner of the emergency room, crying and upset. The victim informed Judd that she had been raped. Mickey Wise, a physician, then examined the victim and administered a rape kit, with which he took a vaginal swab and collected other physical evidence. The victim informed Wise that an "unknown person forced her into his car and . . . forced her to perform oral sex on him, then vaginal intercourse. [He] [e]jaculated in her vagina . . . . He had a large knife with which he poked her on the right hand."

No timely arrest was made in connection with the alleged assault. On or about July 31, 2001, however, the police learned that the DNA obtained from the victim's

rape kit matched that of the defendant.[4] At that time, Waterbury police detective Anthony Rickevicius went to see the victim, but did not show her a photograph of the defendant. Rickevicius then applied for a search warrant for a blood sample from the defendant, which was granted, and the police took the defendant's blood sample on February 8, 2002. Before the confirmation results arrived, however, the victim died of causes unrelated to the assault. On or about August 18, 2003, the police questioned the defendant about the incident and showed him a photograph of the victim. At that time, the defendant signed a statement attesting that he did not know the victim and had not had sexual relations with her, "forced or consensual." The defendant subsequently was charged with sexual assault in the first degree and kidnapping in the first degree in October, 2003.

The following procedural history is also relevant to the resolution of this appeal. Due to the victim's unavailability at trial, the defendant filed a motion in limine to exclude certain of her statements as inadmissible hearsay that would violate his right to confront witnesses against him under the sixth amendment and *Crawford* v. *Washington,* supra, 541 U.S. 68. The trial court denied this motion, concluding that the statements were admissible under hearsay exceptions for spontaneous utterances and statements made for pur-

---

[4] Nicholas Yang, a criminalist, testified before the jury that he had found a match between a DNA sample obtained from the victim's rape kit and the defendant's DNA. Yang found the DNA of approximately three people in the rape kit sample: the defendant, the victim, and a third person. In connection with this testimony, we note that, at a motion hearing on prearrest delay, outside the presence of the jury, the trial court heard testimony that the defendant had been required to register as a sex offender and give a sample of blood on the basis of a previous conviction in October, 1998. The defendant, however, did not register until March, 2001. It was at that point that the match was discovered between the DNA in the rape kit sample and that of the defendant.

poses of medical treatment. At trial, Jones, Kilcran, Judd and Wise were permitted to testify with respect to the victim's statement to them regarding the events of the night of the assault. Robert Slater (informant), an individual who was incarcerated with the defendant and is not related to the defendant, also testified at trial that the defendant told him that he had raped the victim after she refused to have sex with him, although he had paid her for it. The jury returned a verdict of guilty on the charges of sexual assault in the first degree and kidnapping in the first degree, and the trial court sentenced the defendant in accordance with that verdict to two concurrent fifteen year terms of imprisonment.

On appeal to the Appellate Court, the defendant claimed that the trial court improperly had: (1) admitted the victim's statements to Jones, Kilcran, Judd and Wise in violation of his sixth amendment rights; *State* v. *Slater*, supra, 92 Conn. App. 292; and (2) declined to give a specific jury instruction on the informant's potential motives and bias in testifying against the defendant. Id., 308. The Appellate Court concluded that the victim's statement to Jones and Kilcran was not a testimonial statement under *Crawford* and properly was admitted under the hearsay exception for spontaneous utterances. Id., 299–301. It similarly concluded that the trial court properly had admitted the victim's statements to Judd and Wise because those statements were nontestimonial statements that fell within the hearsay exception for statements made for purposes of medical treatment. Id., 307–308. Finally, the Appellate Court concluded that the trial court's failure to give the proposed instruction with respect to the informant's testimony was not harmful error because: (1) the informant's potential inappropriate motive for testifying had been brought to the attention of the jury; (2) the informant's testimony was corroborated by independent evidence; and (3) the court delivered a general instruction to the jury to con-

sider the "interest, bias, or prejudice" of any witness. Id., 310–11.

We granted the defendant's petition for certification to appeal from the Appellate Court's judgment, limited to the following issues: (1) "Did the Appellate Court properly conclude that the victim's statements to civilian bystanders were not testimonial under the confrontation clause?"; (2) "Did the Appellate Court properly conclude that the victim's statements to medical personnel were not testimonial under the confrontation clause?"; and (3) "Did the Appellate Court properly conclude that the failure to give an instruction on the jailhouse informant was harmless?" *State* v. *Slater*, 280 Conn. 950, 912 A.2d 484 (2006). We affirm the judgment in all respects. Additional facts will be set forth as necessary.

I

The defendant contends that the victim's statements to the men on the street and to the medical personnel who administered the rape kit violated his right to confront witnesses against him under the formulation articulated by the Supreme Court in *Crawford*. We disagree.

Under *Crawford* v. *Washington*, supra, 541 U.S. 68, the hearsay[5] statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the

---

[5] There is no dispute that all the statements at issue in the present case constituted hearsay—i.e., they were out-of-court statements offered for the truth of the matter asserted. See *State* v. *Carpenter*, 275 Conn. 785, 821, 882 A.2d 604 (2005) ("admission of out-of-court statements for purposes other than their truth raises no confrontation clause issues"), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

rules of evidence. *Davis* v. *Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Thus, the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature. Because this determination is a question of law, our review is plenary. *State* v. *Kirby*, 280 Conn. 361, 378, 908 A.2d 506 (2006).

In *Crawford*, the Supreme Court declined to "spell out a comprehensive definition of testimonial . . . ." (Internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 541 U.S. 75. Instead, the court defined a testimonial statement in general terms: "A solemn declaration or affirmation made for the purpose of establishing or proving some fact." (Internal quotation marks omitted.) Id., 51. The court did note, however, "three formulations of th[e] core class of testimonial statements . . . [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 268 Conn. 351, 363–64, 844 A.2d 191 (2004), quoting *Crawford* v. *Washington*, supra, 51–52.

Subsequently, in *Davis* v. *Washington*, supra, 547 U.S. 824, the Supreme Court held that the confrontation clause applies only to testimonial hearsay statements, thereby extinguishing any doubt that remained after *Crawford* as to whether sixth amendment concerns similarly limited admission of nontestimonial hearsay

statements.[6] The court again took up the definition of "testimonial" statements, but again declined expressly to set forth an "exhaustive classification of all conceivable statements . . . ." Id., 822. In *Davis*, which involved a victim's statements to a 911 operator in the midst of an attack on her by her former boyfriend, the statements were held to be nontestimonial because, "objectively considered," their primary purpose was not to "establis[h] or prov[e] some fact," but to resolve an ongoing emergency. Id., 826–27. The court concluded that this distinction was apparent "on the face of things," in that: (1) the statements were describing events as they were happening, rather than describing past events; id., 827; (2) "any reasonable listener would recognize that [the victim] . . . was facing an ongoing emergency"; id.; (3) "the nature of what was asked and answered . . . was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past"; (emphasis in original) id.; and (4) the statements were not made in a formal way, manner

---

[6] Prior to the Supreme Court's decision in *Crawford*, courts applied the test set forth in *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), to determine whether the hearsay statements of an unavailable witness may be admitted consistent with the confrontation clause guarantee. Under *Roberts*, such statements may be admitted provided that they have adequate indicia of reliability—i.e., pursuant to a "firmly rooted hearsay exception" or if the statements bore "particularized guarantees of trustworthiness." Id. After *Crawford*, courts were hesitant to abandon the *Roberts* test with respect to nontestimonial hearsay. After *Davis* expressly stated that the confrontation clause does not apply to nontestimonial statements, however, some courts have abandoned the *Roberts* approach. See, e.g., *United States* v. *Williams*, 506 F. 3d 151, 156 (2d Cir. 2007) ("Following *Davis*, we stated . . . that *Roberts'* reliability analysis plays no role in a [c]onfrontation [c]lause inquiry. . . . It is plain from *Davis* that the right to confrontation only extends to testimonial statements, or, put differently, the [c]onfrontation [c]lause simply has no application to nontestimonial statements." [Citations omitted; internal quotation marks omitted.]).

or setting, such as in a police station interview—as was the case in *Crawford*. Id. The court was careful to point out, however, that its holding was highly fact-specific and contextual, noting that under other circumstances "one *might* call 911 to provide a narrative report of a crime absent any imminent danger"; (emphasis in original) id.; and, once the emergency had ended, any information elicited by the operator could be determined to be testimonial. Id., 828–29. Thus, "the court . . . essentially performed a fact intensive test, based on the totality of the circumstances, to each of the cases before it."[7] *State* v. *Arroyo*, 284 Conn. 597, 628, 935 A.2d 975 (2007).

Although we recognize that there is no comprehensive definition of "testimonial," it is clear that much of the Supreme Court's and our own jurisprudence applying *Crawford* largely has focused on the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes.[8] See *Crawford* v. *Washington*, supra, 541 U.S. 52 ("statements that were made under circumstances that would lead an objective witness reasonably to believe the statement would be available

---

[7] *Davis* involved two consolidated cases raising similar *Crawford* issues, the second case being an appeal from the Indiana Supreme Court. See *Hammon* v. *State*, 829 N.E.2d 444 (Ind.), cert. granted, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005). With regard to the appeal in *Hammond*, the United States Supreme Court concluded that the statements of an alleged victim of alleged domestic abuse to police officers on the scene were *not* testimonial because those statements were meant to establish a record of past events and not to resolve an ongoing emergency. *Davis* v. *Washington*, supra, 547 U.S. 829–30. Again, the court emphasized that it was not holding that such statements always would be testimonial. Id., 832.

[8] We view the "primary purpose" gloss articulated in *Davis* as entirely consistent with *Crawford*'s focus on the reasonable expectation of the declarant. As we noted in *State* v. *Arroyo*, supra, 284 Conn. 630, "in focusing on the primary purpose of the communication, *Davis* provides a practical way to resolve what *Crawford* had identified as the crucial issue in determining whether out-of-court statements are testimonial, namely, whether the circumstances would lead an objective witness reasonably to believe that the statements would later be used in a prosecution."

for use at a later trial" [internal quotation marks omitted]); see also, e.g., *State* v. *Camacho,* 282 Conn. 328, 350–51, 924 A.2d 99 (concluding circumstances surrounding statements of coconspirator to his then girlfriend would not lead objective witness to believe statements could later be used at trial because they were made in motel room before police had notified parties of investigation), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Kirby,* supra, 280 Conn. 384–87 (concluding statements made to police dispatcher and police officer were testimonial because victim's primary purpose was to establish past events and not to resolve ongoing emergency within meaning of *Davis*); *State* v. *Carpenter,* 275 Conn. 785, 831–32, 882 A.2d 604 (2005) (concluding statements of family members to social worker in contemplation of probate proceeding reasonably could be expected to be used at trial), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006); *State* v. *Greene,* 274 Conn. 134, 172–73, 874 A.2d 750 (2005) (concluding that no objective witness reasonably could have expected victim's statement to police officer immediately after shooting while officer was securing crime scene would be used at trial because victim's statements, as well as officer's responses, were for purposes of victim receiving medical aid), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006); *State* v. *Aaron L.,* 272 Conn. 798, 813 n.21, 865 A.2d 1135 (2005) (concluding statements of two year old victim to close family member more than seven years before defendant's arrest were not testimonial under *Crawford* objective witness formulation); *State* v. *Rivera,* supra, 268 Conn. 364–65 (concluding that circumstances would not lead objective witness to believe his statement to family member, made of his own initiative many months before he was arrested, would be used at trial).

The focus on the reasonable expectation of the declarant is also substantially in accord with the test

applied by some of the federal Courts of Appeals and other state jurisdictions, post-*Crawford.* See, e.g., *United States* v. *Johnson,* 440 F.3d 832, 843 (6th Cir.) ("The proper inquiry, then, is whether the *declarant* intends to bear testimony against the accused. That intent, in turn, may be determined by querying *whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.*" [Emphasis in original; internal quotation marks omitted.]), cert. denied, 549 U.S. 829, 127 S. Ct. 48, 166 L. Ed. 2d 49 (2006); *United States* v. *Gilbertson,* 435 F.3d 790, 795 (7th Cir. 2006) ("it is readily apparent from *Crawford* that [o]nly statements made following government official initiated ex parte examination or interrogation *developed in anticipation of or in aid of criminal litigation* are encompassed within the core meaning of the confrontation clause" [emphasis added; internal quotation marks omitted]); *United States* v. *Hinton,* 423 F.3d 355, 359 (3d Cir. 2005) (holding that "*Crawford*'s third and broadest formulation of 'testimonial' will ensure compliance with the [c]onfrontation [c]lause"); *People* v. *Stechly,* 225 Ill. 2d 246, 292, 870 N.E.2d 333 (2007) ("the question is whether the objective circumstances indicate that a reasonable person in the declarant's position would have anticipated that his statement likely would be used in prosecution"); *Commonwealth* v. *DeOliveira,* 447 Mass. 56, 63, 849 N.E.2d 218 (2006) ("An out-of-court incriminating statement that is not per se testimonial still may be testimonial in fact. The proper inquiry is whether a reasonable person in the declarant's position would anticipate the statements being used against the accused in investigating and prosecuting a crime." [Internal quotation marks omitted.]); *Harkins* v. *State,* 122 Nev. 974, 987, 143 P.3d 706 (2006) ("Based on United States Supreme Court and Nevada precedent addressing the issue of whether

a hearsay statement is testimonial, it is abundantly clear that the inquiry requires examination of the totality of the circumstances surrounding the making of the statement. We have begun with a general rule: whether the statement would, under the circumstances of its making, lead an *objective witness* reasonably to believe that the statement would be available for use at a later trial." [Emphasis in original; internal quotation marks omitted.]); *State* v. *Stahl*, 111 Ohio St. 3d 186, 196, 855 N.E.2d 834 (2006) ("[i]n determining whether a statement is testimonial for [c]onfrontation [c]lause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations"); *State* v. *Mechling*, 219 W. Va. 366, 376, 633 S.E.2d 311 (2006) ("a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial").

We emphasize, however, that this expectation must be *reasonable* under the circumstances and not some subjective or far-fetched, hypothetical expectation that takes the reasoning in *Crawford* and *Davis* to its logical extreme. Cf. *United States* v. *Feliz*, 467 F.3d 227, 236 (2d Cir. 2006) ("[g]iven that the Supreme Court [in *Crawford*] did not opt for an expansive definition that depended on a declarant's expectations, we are hesitant to do so here"), cert. denied sub nom. *Erbo* v. *United States*, 549 U.S. 1238, 127 S. Ct. 1323, 167 L. Ed. 2d 132 (2007); *People* v. *Bradley*, 22 App. Div. 3d 33, 41, 799 N.Y.S.2d 472 (2005) (concluding that reasonable expectation of declarant focus may be taken to "logical extreme" if, for example, one were to conclude that any statements made to officer could be expected to be used at trial), aff'd, 8 N.Y.3d 124, 862 N.E.2d 79, 830

N.Y.S.2d 1 (2006). With these principles in mind, we turn to the facts of the present case.

## A

The defendant contends that the victim's statement to Jones and Kilcran after the attack that she had been "raped by a black man with a big knife" is a testimonial statement that was inadmissible under *Crawford*.[9] More specifically, the defendant claims that the victim's statements were not made to resolve an ongoing emergency or warn others of impending danger. Rather, the defendant maintains that, under the third formulation from *Crawford*, the circumstances objectively demonstrate that the victim was making a record of past events and fully understood the inculpatory significance of those words. See *Crawford* v. *Washington*, supra, 541 U.S. 52. We cannot agree.

The following additional facts are relevant to our consideration of this issue. Both Kilcran and Jones testified at trial that they were leaving Kilcran's house when they heard the victim screaming and crying outside as she came toward them. When they approached her, she said that someone had tried to rape or had raped her. A written statement Jones gave to the police was admitted as an exhibit at trial. Included in the statement,

---

[9] The state contends that, at oral argument before the trial court on the motion in limine, the defendant waived his *Crawford* claim for the statement made to Jones and Kilcran. We disagree with this contention. Defense counsel argued that *Crawford* barred the admission of the victim's statements to Jones and Kilcran, but then admitted that the argument was "a stretch." The court then presumably ruled on this portion of the motion: "That's her statement. What the witness [Jones] heard, what they heard based upon . . . a time frame, excited utterance, and [the] state's alleging that's an exception to the hearsay [rule] and it is." On the basis of this exchange, we cannot say that defense counsel did not raise and the trial court did not consider the *Crawford* claim with respect to the statements by the victim to Jones and Kilcran. Cf. *State* v. *Fabricatore*, 281 Conn. 469, 481, 915 A.2d 872 (2007) (concluding that there was waiver wherein defense counsel expressly stated that he was satisfied with challenged jury instruction). We therefore review the defendant's *Crawford* claim.

which Jones read in open court, was an account of the following events: that the victim was walking down the street at a fast pace, and that when Jones and Kilcran approached her and asked what was the matter and if they could be of assistance, she stated that "a black male with a big knife just raped her."

Although the mere fact that the victim's statements were not made to a police officer does not dictate whether such statements are testimonial,[10] the circumstances of this case, viewed objectively, would not have led the victim reasonably to believe that her statements to Jones and Kilcran would be used at trial. The victim's statements were not a "solemn" declaration that established a record of past events, but, rather, when taken in context, a cry meant to elicit help from passersby.[11]

---

[10] Although both *Davis* and *Crawford* dealt with situations wherein the declarants were *responding* to questions from law enforcement officers or agents of law enforcement officers, we repeatedly have emphasized that *Crawford* and *Davis* declined to adopt a comprehensive definition of "testimonial." See, e.g., *State* v. *Rivera*, supra 268 Conn. 363. Moreover, in *Davis*, the court acknowledged that the question of whether "statements made to someone other than law enforcement personnel" could be considered testimonial still was open and expressly declined to decide that issue. *Davis* v. *Washington*, supra, 547 U.S. 823 n.2. Indeed, such a holding would be contrary to the Supreme Court's decidedly nonexclusive methodology in sketching out the parameters of what constitutes "testimonial." Therefore, in line with our more recent decision in *State* v. *Arroyo*, supra, 284 Conn. 597, we decline to hold that under no circumstances can statements to individuals with no law enforcement affiliation constitute testimonial statements.

[11] At oral argument and in its brief to this court, the state in the present case made the claim that a cry for help or, in evidence parlance, an excited utterance, could not by definition be a testimonial statement because the apparent frantic state of mind of the declarant would make it impossible objectively to find that the statement was made with the reasonable expectation that it could later be used at trial. While we recognize that the holding in *Davis* at times might make it difficult to hold that such statements are testimonial, the case law in this area eschews bright line rules, and indeed *Hammon* involved an excited utterance, although the court focused on the presence of law enforcement personnel. See footnote 7 of this opinion; see also *Davis* v. *Washington*, supra, 547 U.S. 819–20. Thus, we do not hold that excited utterances are per se nontestimonial.

Several factors support this conclusion. First, the victim was walking down the street at a fast pace crying and screaming, when she made the statements. Like the victim in *Davis*, the victim in the present case clearly was seeking aid, not relating information. Second, when Jones and Kilcran approached the victim, there was no indication that their primary purpose was to do anything but to aid her. They are not police officers and did not seek to investigate or elicit any information from her about the attack. They merely took her inside and telephoned the police. Third, as in *Davis*, the victim's statements were not made or obtained with any degree of formality, solemnity or reflection. Taken together, these facts establish that the victim reasonably would not have expected that she was bearing witness against the defendant when she made the statement that she had been raped by a black man with a knife. Because we conclude that the victim's statement was not testimonial in nature, the confrontation clause was not implicated. *Davis* v. *Washington*, supra, 547 U.S. 823–24.

Accordingly, we turn to our rules of evidence—specifically, hearsay law—to determine whether it was proper to admit the statement to Kilcran and Jones.[12] Because this is not an issue of constitutional magnitude, we review the trial court's determination that the victim's statement was an excited utterance under the abuse of discretion standard. *State* v. *Saucier*, 283 Conn. 207, 219, 926 A.2d 633 (2007) ("whether a statement is

[12] Although the certified question pertains only to whether the Appellate Court properly concluded that the victim's statements to civilian bystanders were not testimonial under the confrontation clause, we examine the admissibility of the statement to Jones and Kilcran because the Appellate Court also analyzed the statement through an evidentiary lens to determine whether it properly was admitted. *State* v. *Slater*, supra, 98 Conn. App. 307–308; see *Fidelity Trust Co.* v. *Irick*, 206 Conn. 484, 487, 538 A.2d 1027 (1988) (noting that this court "will ordinarily consider . . . issues in the form in which they have been framed in the Appellate Court" [internal quotation marks omitted]).

truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the trial court's determination").

Section 8-3 (2) of the Connecticut Code of Evidence provides that a spontaneous utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." A statement properly is admitted as a spontaneous utterance when "(1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001).

Here, the first three requirements undoubtedly were satisfied. The victim had been attacked and raped, and her statements to Jones and Kilcran related to that clearly frightening occurrence. With respect to the fourth factor, although the amount of time that lapsed between the incident and her statement is unclear, the victim still visibly was shaken and appeared to be making the statement as a cry for help. See *State* v. *Kirby*, supra, 280 Conn. 375 ("there is no identifiable discrete time interval within which an utterance becomes spontaneous; each case must be decided on its particular circumstances" [internal quotation marks omitted]); *State* v. *Kelly*, supra, 256 Conn. 42 ("[t]he requirement that a spontaneous utterance be made under such circumstances as to [negate] the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long as the statement is made under the stress of that occurrence" [internal quotation marks omitted]). The victim's emotional state, therefore, indicates that her statement was made under circumstances that had negated the opportunity for deliberation or

fabrication. For these reasons, we conclude that the Appellate Court properly determined that the trial court reasonably had admitted the victim's statement to Jones and Kilcran under the spontaneous utterance exception to the hearsay rule.

B

The defendant next contends that the victim's statements to Judd and Wise were testimonial because they were made in conjunction with the administration of a rape kit and therefore were made in contemplation of a criminal prosecution. The defendant relies, in particular, on the statute governing the collection of evidence in a rape case, General Statutes § 19a-112a, as establishing such intent.[13] We reject this contention.

[13] General Statutes § 19a-112a provides in relevant part: "(a) There is created a Commission on the Standardization of the Collection of Evidence in Sexual Assault Investigations . . . . The commission shall be within the Division of Criminal Justice for administrative purposes only.

"(b) (1) For the purposes of this section, 'protocol' means the state of Connecticut Technical Guidelines for Health Care Response to Victims of Sexual Assault, including the Interim Sexual Assault Toxicology Screen Protocol, as revised from time to time and as incorporated in regulations adopted in accordance with subdivision (2) of this subsection, pertaining to the collection of evidence in any sexual assault investigation.

"(2) The commission shall recommend the protocol to the Chief State's Attorney for adoption as regulations in accordance with the provisions of chapter 54. Such protocol shall include nonoccupational post-exposure prophylaxis for human immunodeficiency virus (nPEP), as recommended by the National Centers for Disease Control. The commission shall annually review the protocol and may annually recommend changes to the protocol for adoption as regulations.

"(c) The commission shall design a sexual assault evidence collection kit and may annually recommend changes in the kit to the Chief State's Attorney. Each kit shall include instructions on the proper use of the kit, standardized reporting forms, standardized tests which shall be performed if the victim so consents and standardized receptacles for the collection and preservation of evidence. The commission shall provide the kits to all health care facilities in the state at which evidence collection examinations are performed at no cost to such health care facilities.

"(d) Each health care facility in the state which provides for the collection of sexual assault evidence shall follow the protocol as described in subsection (b) of this section and, with the consent of the victim, shall collect

The record reveals the following additional facts. Judd testified at trial that, when a woman comes into the hospital complaining that she has been raped, a medical team brings her into a room to ascertain what kind of injuries she has sustained and what happened. As the victim is being interviewed, a nurse takes notes. A physician then administers a rape kit that contains envelopes for forensic evidence collected, such as fingernail clippings, hair samples, saliva, debris from clothing, and vaginal samples. Judd testified that, when she

sexual assault evidence. The health care facility shall contact a police department which shall transfer evidence collected pursuant to subsection (b) of this section, in a manner that maintains the integrity of the evidence, to the Division of Scientific Services within the Department of Public Safety or the Federal Bureau of Investigation laboratory. The agency that receives such evidence shall hold that evidence for sixty days after such collection, except that, if the victim reports the sexual assault to the police, the evidence shall be analyzed upon request of the police department that transferred the evidence to such agency and held by the agency or police department until the conclusion of any criminal proceedings.

"(e) (1) No costs incurred by a health care facility for the examination of a victim of sexual assault, when such examination is performed for the purpose of gathering evidence as prescribed in the protocol, including the costs of testing for pregnancy and sexually transmitted diseases and the costs of prophylactic treatment as provided in the protocol, shall be charged directly or indirectly to such victim. Any such costs shall be charged to the Division of Criminal Justice.

"(2) No costs incurred by a health care facility for any toxicology screening of a victim of sexual assault, when such screening is performed as prescribed in the protocol, shall be charged directly or indirectly to such victim. Any such costs shall be charged to the Division of Scientific Services within the Department of Public Safety.

"(f) The commission shall advise the Chief State's Attorney on the establishment of a mandatory training program for health care facility staff regarding the implementation of the regulations, the use of the evidence collection kit and procedures for handling evidence.

"(g) The commission shall advise the Chief State's Attorney not later than July 1, 1997, on the development of a sexual assault examiner program and annually thereafter on the implementation and effectiveness of such program."

Although we note that several changes have been made to § 19a-112a since the time of the incident in the present case when the victim was administered the rape kit, those changes are not relevant to this appeal. For purposes of convenience, we refer to the present revision of the statute.

encountered the victim in the present case, the victim was "crying [and] hovering" in the corner of the emergency room, as if trying to hide. The victim's chief complaint was that she had been raped. The victim also had a puncture wound on her hand, but there was no profuse bleeding. Judd testified that she and Wise then administered the rape kit according to procedure. Judd also did a blood test to check for venereal disease.

Wise testified with regard to the administration of a rape kit that "the patient is brought in, then we take a history from the patient and do an exam that's focused on gathering evidence from the sexual assault as well as assessing the patient for any other injuries that may have occurred." Wise read his notes of the victim's history in open court: "[U]nknown person forced [victim] into his car and forced her to perform oral sex . . . on him, then vaginal intercourse. Ejaculated in her vagina. He did not hit her. [S]he did not hit, scratch or bite him. He had a large knife with which he poked her on the right hand." Wise testified that his observations of the victim's physical condition were consistent with the account that she had given him.

In *State* v. *Kirby*, supra, 280 Conn. 388–92, we held that statements of a kidnap victim made solely for medical purposes, and not in anticipation of criminal proceedings, were nontestimonial. In that case, the victim, who had died before trial, made statements to an ambulance attendant that she had been kidnapped, thrown down, tied up and taken for several hours, and that she had sustained numerous abrasions and lacerations and had stomach and chest pains. Id., 388–89. We determined that these statements were not testimonial because the examination and questioning had a diagnostic purpose, and the victim's statements were the byproduct of substantive medical activity and did not accuse or identify the perpetrator of the assault. Id., 391. Similarly, in *State* v. *Arroyo*, supra, 284 Conn. 626,

635, we held that an interview by a licensed clinical social worker and forensic interviewer with a child victim of sexual assault did not produce testimonial statements, despite the fact that police officials were permitted to watch the interview from behind a one-way mirror. There was no evidence that the interview had been conducted at the request of law enforcement officers. Id., 635. Thus, we concluded, based on the structure of the clinic's treatment of alleged victims of sexual abuse, that the primary purpose of the interview had been to determine the next steps to ensure the mental and physical health and well-being of the child, not to gather evidence for prosecution. Id.

Similarly, in the present case, the nature of the victim's statements and the context in which they were elicited make it clear that she reasonably expected that she was speaking primarily to provide Wise and Judd with information that would enable them to treat her. Every statement that Wise recorded related to the treatment of a potential injury. For instance, the victim described all exchanges of bodily fluid, i.e., through oral and vaginal intercourse, and that the defendant had ejaculated in her vagina. All of these details would be relevant to assessing the patient for possible pregnancy and sexually transmitted diseases. Indeed, Judd testified that she had administered a blood test for venereal disease before the victim left the hospital. The statement regarding the puncture wound on her hand undoubtedly relates to medical treatment as well. None of the victim's statements related to the identity of her assailant nor to other details of the crime unrelated to medical treatment, such as, for example, the make and model of the van, the type of knife, or the location of the assault.

The defendant contends that the administration of a rape kit for the collection of evidence necessarily would have made it apparent to the victim that her statements

could be used later at trial. Under the facts of this case, we cannot agree. Section 19a-112a does require that medical personnel administer a rape kit to collect and preserve *physical* evidence related to the assault. That fact, however, does not eviscerate the medical treatment purpose of the examination for the victim.[14]

In *State* v. *Stahl*, supra, 111 Ohio. St. 3d 186, the Ohio Supreme Court faced a similar set of facts. The defendant claimed that the admission of a deceased rape victim's statements to a nurse at a special unit of a hospital's emergency room that dealt with victims of sexual assault and domestic disturbances (special unit) had violated his rights under the confrontation clause. Id., 189. In that case, the victim had signed a consent form agreeing to release all "evidence, information, clothing, and photographs for prosecution of the case." Id., 187. As part of its rejection of the defendant's challenge to the admission of the victim's statements, the court determined that, although the special unit had a secondary function in helping to collect evidence, its primary purpose was the care of its patients. Id., 196–97. The court concluded that the government funding, mission statement and special procedures of the special

---

[14] The defendant makes much of § 19a-112a, highlighting portions of the statute that relate to law enforcement. We think this unduly limits the varied purposes of the statute. The statute, on its face, is concerned not only with the creation of a protocol for the collection of evidence from victims of sexual assault by health care facilities; General Statutes § 19a-112a (b) and (c); but also with medical testing and treatment for sexually transmitted diseases and pregnancy. General Statutes § 19a-112a (b) (2) and (e) (1). Moreover, this section is part of a statutory *scheme* that provides for the health and well-being of victims of sexual assault. See General Statutes § 19a-112b (counseling, health care and support services for victims of sexual assault); General Statutes § 19a-112c (educational materials for victims of sexual assault); General Statutes § 19a-112d (funds for sexual assault victims). We see no reason, therefore, why this statute should automatically— or even substantially—influence a determination that statements made to physicians and nurses at a health care facility where a rape kit for the collection of forensic evidence is being administered are testimonial in nature.

unit relating to the collection of forensic evidence did not render the victim's statements inherently testimonial. Id., 197–98. In addition, the victim had given a detailed statement of events to the nurse, including the identity of her attacker and the events leading up to the attack. Id., 188, 198. The court determined that the victim's statement to the nurse was not testimonial because she had made the identical statement to the police moments earlier and thus, despite information on the consent form, reasonably would have expected that her statements were for purposes of medical treatment, such as the determination of whether the sexual assailant had any communicable diseases, and not for use at trial. Id., 198. The court also noted that the circumstances were such that the victim reasonably could have believed that her *statement* would be used for health care purposes, but that the *physical* evidence would be used for forensic purposes. Id., 199.

We find the reasoning of *Stahl* persuasive and similarly see no reason why the procedure regarding rape kits should categorically, or under the specific facts of this case, render the victim's statements testimonial. A rape victim is necessarily in need of medical attention. See *State* v. *Cruz*, 260 Conn. 1, 11–15, 792 A.2d 823 (2002) (concluding that broad range of statements of victim of sexual assault, including identity of perpetrator, were for purposes of physical and mental treatment). When such a victim is brought to a hospital, even by the police, we expect that his or her most pressing concern is getting medical attention and not providing a record of facts, despite the administration of a rape kit. Accordingly, for the foregoing reasons, we conclude that the victim's statements to Wise and Judd were not testimonial.

We next determine whether such statements properly were admitted under the hearsay exception for statements made for purposes of medical treatment. See

footnote 12 of this opinion. Section 8-3 (5) of the Connecticut Code of Evidence contains an exception to the hearsay rule for "[a] statement made for purposes of obtaining medical treatment or advice pertaining thereto and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical treatment or advice." Regardless of whether the statements were made to a physician, they must all have been "made in furtherance of medical treatment." *State* v. *Aaron L.*, supra, 272 Conn. 814.

As we stated previously herein, *all* of the victim's statements to Judd and Wise related in some way to her visible or potential injuries. We thus have no trouble concluding that the Appellate Court properly determined that the trial court reasonably had admitted each of these statements under the medical treatment exception.

## II

Finally, the defendant contends that the trial court's denial of his requested jury charge as to the possible motives and bias of the informant, who testified at trial, was harmful error. More specifically, the defendant contends that, without the informant's testimony, there was insufficient evidence on which the jury could have convicted him. The defendant asserts that, without the informant's testimony, the jury would have had only the DNA evidence, which was weakened substantially by the fact that another unknown individual's DNA also was found on the rape kit swab. See footnote 4 of this opinion. This limited evidence, coupled with the trial court's general credibility instruction, renders the error harmful, according to the defendant. We disagree.

The following additional facts are relevant to this claim. The informant shared the same cell block as the

defendant, and offered the following testimony at trial. He testified that the defendant had confided in him after the defendant had a meeting with his attorney and quoted the defendant as saying: "These people ain't got nothing on me . . . they got some DNA, I'm going [to] switch it around now, I'm going to say it was consensual." Additionally, in a subsequent conversation, the defendant had identified the victim by name and stated that he had purchased sex from her "once or twice before . . . ." The defendant stated to the informant that, on the night in question, the victim had taken money from the defendant and left. The defendant stated that he tracked the victim down in his car and that he was carrying a knife.

The following exchange took place between the state's attorney and the informant:

"[The Informant]: Apparently, [the defendant] went off in some empty area, that's where he did what he had to do.

"[State's Attorney]: What did he tell you that he did?

"[The Informant]: He took it, took that ass, basically how it came out. . . . He said, yeah, I took ass, but they can't prove it. She can't talk."

During both direct and cross-examination, the informant admitted to having more than thirty felony convictions, having been a fugitive from justice, and being a drug addict. He also acknowledged that he had used approximately five aliases and possessed a fictitious driver's license. At the time of his testimony, the informant was serving a prison sentence, and he still had five felony charges and three misdemeanor charges pending against him, which cumulatively could have carried a total sentence of thirty years.

On both direct and cross-examination, however, the informant repeatedly stated that the state had made

absolutely no promises to him in exchange for his testimony.[15] After the informant had testified, and outside of the presence of the jury, the state's attorney informed the trial court that in fact he had told the informant that he would bring his cooperation to the attention of the sentencing judge on his pending cases. Then, the state's attorney called police inspector James Deeley to testify before the jury that the state had promised to bring the informant's cooperation to the attention of his sentencing judge. Scott Stevenson, a Waterbury police sergeant, also testified that, on one other prior occasion, he had heard the state's attorney tell the informant that he could make him no promises, but that he would bring the informant's cooperation to the attention of the sentencing judge. In his summation to the jury, the defendant also emphasized that the informant's testimony could have been influenced by his desire for leniency in his pending state cases.

The trial court denied the defendant's request to provide the following instruction to the jury specifically with regard to the informant's credibility: "Also there has been evidence that [the informant] has pending criminal cases and that the state's attorney in this case informed him that he would bring the fact that he testified for the state in this case to the attention of the court that might sentence him. . . . Such evidence may be relevant to show a motive, an interest, a bias or

---

[15] The following exchange took place between defense counsel and the informant:

"Q. You are absolutely sure that [the state's attorney] never said anything to you at all, a promise of anything?

"A. No.

"Q. Whatsoever?

"A. No. . . .

"Q. So you're absolutely clear that [the state's attorney] never said anything to you to the effect that he will let your cooperation [be] known, he'll tell the sentencing judge concerning the pending cases that you have?

"A. Are you clear of it? Because I told you that a couple of times. No."

prejudice and that [the informant's] testimony was motivated by the hope for leniency . . . ." Instead, in its instructions, the court told the jury that it could take into account whether a "witness [had] an interest in the outcome of this case or any bias or prejudice concerning any party or matter involved in the case" in passing on the credibility of that witness. The court further instructed that the jury could take into account prior convictions and pending cases. The court stated: "Prior convictions and pending cases of a witness. That witness was [the informant]. There was testimony here of previous felony convictions on the part of [the informant]. . . . That evidence was offered and admitted for one purpose only, to address the question of credibility or believability of [the informant]."

In *State* v. *Patterson*, 276 Conn. 452, 464, 886 A.2d 777 (2005), we concluded that it was harmful error for the trial court to fail to instruct the jury specifically to view a jailhouse informant's testimony with caution because of the benefits that the informant had received in exchange for his testimony. In that case, we concluded that the testimony of a jailhouse informant who has received promises of leniency from the state carries the same credibility concerns as does the testimony of an accomplice who has received such promises. Id., 470. Therefore, we determined that the defendant was entitled to an instruction that singled out the informant and highlighted his possible motive for testifying falsely. Id., 467–71.

In the present case, the state conceded before the Appellate Court that the trial court's failure to deliver a specific charge as to the informant's credibility was improper. *State* v. *Slater*, supra, 98 Conn. App. 309. The only issue before us then is whether that impropriety was harmful. "[A]n instructional error relating to general principles of witness credibility is not constitutional in nature. . . . Consequently, the defendant

bears the burden of establishing that the error deprived him of his due process right to a fair trial." (Citation omitted.) *State* v. *Patterson*, supra, 276 Conn. 471–72. "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 602, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007).

"Several factors guide our determination of whether the trial court's failure to give the requested instruction was harmful. These considerations include: (1) the extent to which [the informant's] apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature of the court's instructions on witness credibility; (3) whether [the informant's] testimony was corroborated by substantial independent evidence; and (4) the relative importance of [the informant's] testimony to the state's case." *State* v. *Patterson*, supra, 276 Conn. 472.

With respect to the first factor, the informant's potentially improper motive for testifying in the present case amply was brought to the attention of the jury. First, the state called two witnesses to the stand who stated that the state's attorney had promised the informant that he would bring the informant's cooperation to the attention of his sentencing judge. Second, although the informant falsely testified that the state's attorney had not promised him anything in exchange for his testimony, the defendant brought the informant's past history of untruthfulness and criminal activity into sharp focus for the jury. Finally, the defendant emphasized in his summation the informant's potential motive to lie. Moreover, with respect to the second factor, the court's instructions, in addition to a general instruction on the motives and bias of witnesses, specifically named the informant and pointed out that the jury could con-

sider his past convictions in determining his credibility. Thus, the instruction was not as deficient as in *Patterson*, wherein the court had delivered only general instructions on the credibility of all the witnesses. See id., 466 n.10.

We then turn to the third and fourth factors together to assess whether the informant's testimony was so essential that its absence substantially would have affected the verdict. First, there was other corroborating evidence that directly and indirectly implicated the defendant in the commission of the crime. The victim had identified her attacker as a black male. Although this is certainly only the most general of descriptions, it does match that of the defendant. Most importantly, the defendant's DNA was found in the victim on that evening. The DNA evidence directly linked the defendant and the victim. It also *contradicted* the defendant's statement to the police that he did not know the victim and never had had sexual relations with her, whether forced or consensual. It is well settled under our law that lies told to the police are evidence that create an inference of guilt. *State* v. *Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990) ("misstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt" [internal quotation marks omitted]); *State* v. *Oliveras*, 210 Conn. 751, 759, 557 A.2d 534 (1989) ("[e]vidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, *or* [giving] a *false statement*, is ordinarily the basis for a charge on the inference of consciousness of guilt" [emphasis added]).

From this evidence, we conclude that "the error did not substantially affect the verdict." (Internal quotation

marks omitted.) *State* v. *George J.*, supra, 280 Conn. 602. The defendant has not met his burden, therefore, to show that the trial court's failure to deliver the specific *Patterson* instruction on the credibility of the informant was harmful error.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.