### STATE OF CONNECTICUT *v.* JUMA A. LAHAI
### (AC 30219)

DiPentima, C. J., and Gruendel and Flynn, Js.

Argued February 8—officially released May 10, 2011

*Dominic Spinelli,* certified legal intern, with whom were *Timothy H. Everett,* special public defender, *Louisa Lindberg,* certified legal intern, and, on the brief, *Amy Gilgis, Christian de Ocejo* and *Kelly Scott,* certified legal interns, for the appellant (defendant).

*James M. Ralls,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *James R. Dinnan,* senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Juma A. Lahai, appeals from the judgment of conviction, rendered after a jury trial, of assault in the third degree in violation of General Statutes § 53a-61 (a) (1). He also appeals from the judgment of conviction on part B of the information of being a persistent offender in violation of General Statutes (Rev. 2007) § 53a-40d. The defendant claims that (1) the trial court improperly instructed the jury on self-defense, (2) his trial counsel rendered ineffective assistance and (3) he was deprived of his constitutional right to confrontation under the sixth amendment to the United States constitution during the part B proceeding. We affirm the judgment of the trial court.

The jury reasonably could have found the following relevant facts. During the late afternoon of October 27, 2006, an argument ensued between the defendant and Elizabeth Hutchinson, the mother of his infant daughter, at Hutchinson's residence in Meriden. The two had known each other for two years and argued frequently. On this occasion, the argument intensified, and the defendant struck Hutchinson in the face multiple times after she tossed a bottle of lotion his way. When officers from the Meriden police department responded to a 911 call from Amy Lukasik, a friend whom Hutchinson

had telephoned during the argument with the defendant, they observed three fresh bruises on Hutchinson's face. Hutchinson at that time explained that the two had a history of unreported domestic violence and stated that the defendant had hit her during this particular dispute. The officers also spoke with the defendant, who denied striking Hutchinson.

The defendant was arrested and charged, by substitute information filed January 9, 2008, with assault in the third degree and unlawful restraint in the second degree in violation of General Statutes § 53a-96 (a). In addition, he also was charged in part B of the information as a persistent offender. At trial, the defendant testified that, during the October 27, 2006 argument, he first struck Hutchinson on the side of her face after she threw a bottle of lotion in his direction. He testified that Hutchinson subsequently retrieved a knife from the kitchen and attempted to stab him with it. With his back allegedly against a wall, the defendant testified that he reacted in self-defense by hitting her again. At the conclusion of trial, the jury found the defendant guilty of assault in the third degree and found him not guilty of the unlawful restraint charge. After further proceedings, the jury found the defendant guilty on part B of the information. The court rendered judgment in accordance with the jury's verdicts and sentenced the defendant to a total effective term of five years incarceration. This appeal followed.

I

The defendant first challenges the court's instruction on the justification of self-defense. He argues, and the state concedes, that the court's instruction was improper, as it mistakenly characterized self-defense as an "affirmative defense" that "the defendant bears the burden of establishing . . . by a preponderance of the evidence," and further provided that the state bore

the burden of disproving that defense beyond a reasonable doubt only after the defendant satisfied his initial burden. The defendant maintains that the court's improper instruction deprived him of his constitutional rights to due process and a fair trial. The defendant did not preserve that claim at trial and now seeks to prevail pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[1] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. We afford review because the record is adequate for review and the claim is of constitutional dimension. See *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994) (improper instruction on defense, like improper instruction on element of offense, is of constitutional dimension). We nevertheless conclude that the claim fails to satisfy *Golding*'s third prong.

The following additional facts are relevant to the claim. When jury selection commenced on January 10, 2008, the court noted that it had addressed "a number of administrative issues" with the parties during a discussion in chambers days earlier. The following colloquy then transpired:

"The Court: . . . The primary concern of the court was, of course, the attempt to identify any issues that

---

[1] Although the defendant alternatively requests review pursuant to the plain error doctrine; see Practice Book § 60-5; his claim does not present the type of extraordinary situation implicating that doctrine. See *State* v. *Smith*, 275 Conn. 205, 240, 881 A.2d 160 (2005).

might arise in the course of jury selection . . . . There were no particular issues, with this exception. There was a question as to whether or not there would be any affirmative issues related to self-defense. . . . I had asked [defense counsel] to consider that . . . . We didn't go on the record, no orders were issued. But, for the convenience of the court, I now inquire, will it be your intention to request a jury charge on that subject and to present evidence on that issue?

"[Defense Counsel]: Yes. I did want an affirmative defense jury instruction on self-defense. . . . I can put that in written form, if you'd like.

"The Court: I'd not just like it, I'm ordering, now, counsel. . . . Prior to the start of business tomorrow . . . you must submit to the court, in writing, your preliminary jury instructions. . . . That writing may be as simple as the following format, which is, indeed, of great assistance to the court. As you are well aware, the public has access to, as do all lawyers, the web based charges on the judicial branch website. . . . It's of assistance to the court, if any of those, or all of your needs for jury charges can be fulfilled by utilizing the web based charges. It's of assistance to the court to use the following format. Request in writing that the court charge, for instance, § 2.1, § 2.6, § 11.15, in whatever order you find to be appropriate to meet your needs, your client's needs. If you wish to embellish upon, or request in addition or in lieu of anything that's on the web, particularized instructions, you must submit those in writing, and I will need your drafts by tomorrow morning." At that time, both parties indicated their agreement with that process.

Both parties submitted proposed jury instructions the next day. The defendant's proposed instruction on self-defense provides in relevant part that "[o]nce [self-defense] is raised in a case, the state must disprove the

defense beyond a reasonable doubt." By contrast, the state submitted the following preliminary request to charge: "The state respectfully requests the [c]ourt to include the following instructions from the [j]udicial [b]ranch [c]riminal [j]ury instruction website in its jury charge. 2.3, 2.4, 2.6, 2.7, 2.8, 2.10, 2.12, 2.13, 2.25, 2.29, 2.47, 2.51, 6.15, 6.36. The state will submit a final detailed request to charge at the conclusion of evidence." Included among those enumerated provisions was § 2.10, which detailed the preponderance of the evidence standard applicable to affirmative defenses. See J. Pellegrino, Connecticut Selected Jury Instructions: Criminal (3d Ed. 2001) § 2.10.

On January 16, 2008, the court heard argument on certain pretrial motions. At that time, the court addressed "one other matter I did not bring to your attention in chambers." After referencing "the committee proposed jury charge on the affirmative self-defense issue,"[2] the court stated: "I have also determined . . . upon review of [defense counsel's] requested charge on self-defense, the following. Although I've indicated that I will not be marshaling evidence, *I would have you draft exactly what language you would have the court insert* into the various fields upon the website version. . . . And I would have you specifically prepare a draft of that charge." (Emphasis added.) Similarly, on January 23, 2008, the court again discussed certain aspects of "the self-defense issue," including the subjective and objective analyses thereof. At that time, the court recounted its earlier reminder to defense counsel in chambers: "I did, once again, reiterate the

---

[2] In its January 8, 2010 rectification, the court indicated that its reference to "the committee proposed jury charge" likely referred "to the proposed jury instructions, available on the [judicial branch website] after December 1, 2007, that related to § 2.8 'Justification Defenses' . . . and § 2.9 'Affirmative Defenses.' " As the defendant acknowledges in his appellate brief, the record before us does not contain the committee proposed jury charge referenced by the court.

order . . . that prior to the commencement of evidence the court receive from the defendant a self-defense charge, if you will be requesting one, that identifies with specificity the particularities. . . . I did not receive that . . . . I expect that certainly before I charge the jury, otherwise your record [will] reflect that which was previously submitted and nothing more."

The defendant filed his final request to charge the next day. The defendant's requested instruction on affirmative defenses provided in relevant part that "[w]hen a defense declared to be an affirmative defense is raised at a trial, the defendant has the burden of establishing such defense by a preponderance of the evidence. . . . If you are to find the defendant not guilty on the basis of the defendant's affirmative defense of self-defense, you must find that the defendant has proven it by a preponderance of the evidence." (Internal quotation marks omitted.) His requested instruction on self-defense further indicated that it was a defense that the state must disprove "beyond a reasonable doubt."

At the outset of that day's proceedings, the court again addressed the issue of the self-defense instruction. It stated: "Counsel, in chambers, this morning, I received additional jury instructions. They include a request by the defendant that I utilize the affirmative defense language and the preponderance [of the evidence]. The defendant's request that I utilize the affirmative defense language that is contained [in the judicial branch website] charges . . . [although] I had that [language] on the original charge, [I] deleted it, as there had been no request. I'll add it back in. I will also, however, add the preponderance of the evidence charge straight from the web because otherwise the jury will have no idea what that means." The defendant voiced no objection at that time. The record further reflects that the court provided defense counsel the opportunity to review its instructions on self-defense later that day.

The court stated: "It's about twenty minutes after twelve, counsel. I'm certain there have been some changes. I'll need to meet with you to review the additions that I'll be making to the charge. I do want to go over it with you. I note that [defense counsel] has, again, he has submitted a more extensive charge request. I think I've covered everything. Now, I had the opportunity to add back in from my original draft the charge on affirmative defenses. [The prosecutor] had actually requested in his initial proposal the charge on preponderance. So, I had that all ready to go as well. Shall we let the jury go [until two o'clock]? I'm sure [that] would be most convenient for the staff."[3]

During its charge to the jury, the court instructed in relevant part: "[T]he evidence in this case raises the issue of self-defense with regard to the charge of assault in the third degree . . . . As the defendant has raised the affirmative defense of self-defense, the defendant bears the burden of establishing this defense by a preponderance of the evidence, and there are certain issues the jury must decide, as I will explain to you. . . . To prove the affirmative defense of self-defense, in this case, the defendant must prove by a preponderance of the evidence that he acted in self-defense on October 27, 2006, at the time and place of the assault alleged by the state. . . . You must understand, however, that the defendant does not have to prove beyond a reasonable doubt that he acted in self-defense. The burden of proving matters beyond a reasonable doubt falls upon the state, as I have instructed you throughout this jury charge. . . . Now, I will instruct you on the law of self-defense . . . . Self-defense is [the] means by which the law justifies the use of force that would otherwise be illegal. Because the issue of self-defense has been

---

[3] The defendant does claim that the court failed to allow him a meaningful opportunity to review its charge on self-defense or solicit input from counsel regarding modification thereof.

raised in this case, if you find that the defendant has met his burden of proving the affirmative defense by a preponderance of the evidence, then the state must disprove the defense beyond a reasonable doubt in order for the jury to render a verdict of guilty on the first count . . . ."

On appeal, the state maintains that the doctrine of induced error precludes the defendant from prevailing under *Golding*'s third prong. We agree. "It is well established in Connecticut that unpreserved claims of improper jury instructions are reviewable under *Golding* unless they have been induced or implicitly waived. The term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . This court has found induced error undeserving of appellate review in the context of a jury instruction claim when the defense has affirmatively requested the challenged jury instruction . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 468–69, 10 A.3d 942 (2011). "This principle bars appellate review of induced nonconstitutional *and* induced constitutional error." (Emphasis in original.) *State* v. *Brunetti*, 279 Conn. 39, 59 n.32, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

In his final request to charge, the defendant requested that the court instruct the jury, inter alia, both that "[i]f you are to find the defendant not guilty on the basis of the defendant's affirmative defense of self-defense, you must find that the defendant has proven it by a preponderance of the evidence" and also that "the state must disprove this defense beyond a reasonable doubt." In so doing, the defendant induced the error of which he now complains. Accordingly, the defendant's claim flounders under *Golding*'s third prong. See *State* v.

*Kitchens,* supra, 299 Conn. 469; *State* v. *Cruz,* 269 Conn. 97, 106, 848 A.2d 445 (2004).

The defendant nonetheless presents a twofold attack on the court's charge. First, the defendant argues that, in requesting an instruction on the "affirmative defense" of self-defense and the preponderance of evidence standard, he merely was complying with an order of the court to include such an instruction in his request to charge in light of the January 10, 2008 colloquy between the court and defense counsel. A review of the record belies that claim. At that time, the court simply inquired of counsel as to whether "there would be any affirmative issues related to self-defense," to which defense counsel replied that he wanted "an *affirmative defense* jury instruction on self-defense." (Emphasis added.) It was in response to counsel's subsequent statement that he could "put that in written form, if you'd like," that the court stated, "I'd not just like it, I'm ordering, now, counsel." Plainly, the court was ordering counsel to submit his requested instruction in writing. That it was not ordering counsel to include an affirmative defense instruction is evidenced by the court's remark moments later that counsel was free to "embellish upon, or request in addition or in lieu of anything that's on the [judicial branch website] instructions" in his written request. On January 16, 2008, the court again articulated its receptiveness to any alterations to its self-defense charge that defense counsel deemed appropriate, stating that it *"would have you draft exactly what language you would have the court insert* into the various fields upon the website version. . . . And I would have you specifically prepare a draft of that charge." (Emphasis added.) Furthermore, as already chronicled in this opinion, the court repeatedly provided defense counsel the opportunity to review its charge and provide input thereon.

The second basis on which the defendant's claim hinges is his contention that the state first induced the improper instruction by raising the issue of self-defense as an affirmative defense in its January 11, 2008 preliminary request to charge. That assertion is undercut by the fact that it was defense counsel who one day earlier informed the court that he wanted "an affirmative defense jury instruction on self-defense." Moreover, this court has recognized that the fact that the state also requested an instruction akin to that submitted by a defendant that induces an instructional error does not minimize the defendant's "active role in crafting the charge given by the court." *State* v. *Dawson*, 117 Conn. App. 845, 859, 982 A.2d 203, cert. denied, 294 Conn. 922, 984 A.2d 1083 (2009).

Finally, we are mindful that our Supreme Court recently clarified this aspect of our criminal jurisprudence. In *State* v. *Kitchens*, supra, 299 Conn. 482–83, the court concluded that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." That measure is met in the present case. Counsel's affirmative acceptance of the court's instructions is manifested by his final request to charge and his failure to voice any objection when the court reviewed the instructions with counsel before they were delivered.[4]

---

[4] At oral argument before this court, counsel for the defendant remarked that the present case involves "an express waiver" on the part of trial counsel. In its reply brief, the defendant nonetheless submits that defense counsel never can waive an objection to a jury instruction that dilutes the state's burden of proof beyond a reasonable doubt. For two reasons, that distinct claim is unavailing. First, "[i]t is well established . . . that [c]laims . . . are unreviewable when raised for the first time in a reply brief." (Inter-

Thus, even had he not induced the error of which he complains, the defendant's waiver of his claim precludes success under the third prong of *Golding*.

## II

The defendant next alleges that his trial counsel, in submitting the aforementioned request to charge on the issue of self-defense, rendered ineffective assistance. The claim merits little discussion. As our Supreme Court recently observed, "a habeas proceeding provides a superior forum for the review of a claim of ineffective assistance because it provides the opportunity for an evidentiary hearing in which the attorney whose conduct is challenged may testify regarding the reasons he did not contest the instruction at trial. See *State* v. *Leecan*, 198 Conn. 517, 541, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). A habeas proceeding thus enables the court to determine whether counsel's failure to take exception or otherwise to participate in formulating the instructions was due to mere incompetence or to counsel's trial strategy, which would not be possible in a direct appeal in which there is no possibility of an evidentiary hearing." *State* v. *Kitchens*, supra, 299 Conn. 496–97. Accordingly, "[a]n aggrieved party is thus not without recourse in the event that the court deems a claim of instructional

nal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 302, 977 A.2d 189 (2009). One rationale for that maxim is the fact that "[a]rguments first presented in a reply brief impair the opposing party's opportunity to reply in writing." *State* v. *Rosario*, 113 Conn. App. 79, 93, 966 A.2d 249, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009). Such is the case here. Second, our Supreme Court recently emphasized that "[a] defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . [A]mong the rights that may be waived by the action of counsel in a criminal proceeding is the right of a defendant to proper jury instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 467. Bound by the decisions of this state's highest court, we decline to reconsider or replace that precedent. See *State* v. *Smith*, 107 Conn. App. 666, 684–85, 946 A.2d 319, cert. denied, 288 Conn. 902, 952 A.2d 811 (2008).

impropriety waived on appeal." Id., 497. Because the record before us is devoid of any explanation as to why the defendant's trial counsel submitted the aforementioned instruction on self-defense and agreed to the court's charge thereon, review of that claim is unwarranted in this direct appeal.

### III

The defendant's third and final claim is that he was deprived of his constitutional right to confrontation under the sixth amendment to the United States constitution during the part B proceeding.[5] Specifically, he argues that the court improperly admitted into evidence a May 29, 2002 West Haven police incident report (police report) and allowed the state to adduce the testimony of Achilles Generoso, an inspector for the state, related thereto. The defendant contends that the police report and Generoso's testimony thereon constitute testimonial hearsay violative of his right of confrontation.

The following additional facts are relevant to the defendant's claim. After the jury returned a verdict of guilty on the charge of assault in the third degree, the part B proceeding commenced. Because § 53a-40d contains two prerequisites to the imposition of an enhanced sentence for being a persistent offender, the court bifurcated that trial.[6] The first part concerned whether the

---

[5] The sixth amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI.

[6] General Statutes (Rev. to 2007) § 53a-40d provides in relevant part: "(a) A persistent offender of crimes involving assault . . . is a person who (1) stands convicted of assault under section 53a-61 . . . and (2) has, within the five years preceding the commission of the present crime, been convicted of a capital felony, a class A felony, a class B felony, except . . . a class C felony, except . . . or a class D felony under . . . [or] assault under section 53a-61 . . . [or] criminal violation of a protective order . . . .

"(b) When any person has been found to be a persistent offender of crimes involving assault . . . and the court is of the opinion that such person's history and character and the nature and circumstances of such person's criminal conduct indicate that an increased penalty will best serve the public

defendant had been convicted of a similar offense in the past five years, while the second part addressed whether an enhanced sentence would best serve the public interest.

During the first portion of the part B proceeding, the state offered the testimony of Generoso and Susan D'Agostino, a court clerk. The state also introduced into evidence five exhibits, including certified copies of the defendant's December 18, 2002 convictions for criminal violation of a protective order in violation of General Statutes § 53a-110b and assault of a pregnant person in the third degree in violation of General Statutes § 53a-61a. The jury thereafter found the defendant guilty of being a persistent offender, a determination he does not contest in this appeal.

During the second portion of the proceeding, the state presented evidence in an attempt to demonstrate that the defendant's "history and character and the nature and circumstances of [his] criminal conduct indicate that an increased penalty will best serve the public interest . . . ." General Statutes (Rev. to 2007) § 53a-40d (b). Its sole witness was Generoso, who began his testimony with a review of exhibit F, a certified copy of the defendant's December 18, 2002 conviction for unlawful restraint in the first degree in violation of General Statutes § 53a-95, and exhibit G, a report documenting the defendant's criminal history. At that time, Generoso noted that the defendant had been convicted of, inter alia, assault of a pregnant person in the third degree stemming from an altercation that transpired on October 11, 2001, and unlawful restraint in the first

interest, the court shall, in lieu of imposing the sentence authorized for the crime under section 53a-36 or section 53a-35a, as applicable, impose the sentence of imprisonment authorized by said section 53a-36 or section 53a-35a for the next more serious degree of misdemeanor or felony, except that if the crime is a class A misdemeanor the court shall impose the sentence of imprisonment for a class D felony, as authorized by section 53a-35a."

degree stemming from the incident memorialized in the police report. The defendant did not object to that testimony.

The prosecutor then asked Generoso a series of preliminary questions regarding the police report, which had been marked for identification as exhibit H. When the prosecutor asked the court to admit the police report as a full exhibit, defense counsel objected immediately. The following colloquy occurred:

"[Defense Counsel]: Your Honor, I'm going to object to the introduction of [the police report] as a full exhibit for a couple of reasons. The first is, the author of this document is not going to be here for me to cross-examine.

"The Court: I'm going to overrule that aspect of the objection. . . . Are there any particular portions of the document . . . to which you have specific objection, or is it the entire document to which you object?

"[Defense Counsel]: It's the entire document, Your Honor. I can't verify the veracity of the document. I mean, I can't—I'm just reading it for the first time. And without an opportunity to cross-examine the author of this document, I have no basis of knowledge to know whether this information is accurate or not."

Despite that objection, the court admitted the police report as a full exhibit. When the court later remarked to defense counsel, "I take it that you're still claiming that the [police report], in its entirety, comes out," counsel replied affirmatively and again expressed his concern that "I obviously want the entire document excluded. . . . I can't cross-examine the officer. It's a document that is going to enter into evidence without any type of cross-examination or verification of veracity." Generoso thereafter detailed the contents of the

police report in extensive fashion.[7] When his testimony

[7] Stamped "family violence" on the top, the police report indicates that it was prepared by Officer D. Hancock, though the attesting signatures are difficult to decipher. In that report, Hancock stated: "On [May 28, 2002] at 2316 hours, the Orange [p]olice [d]epartment called to report that they had just received a 911 call from Stop & Shop, Bull Hill Lane, Orange about an assault that had just occurred at 79 Meadowbrook Court, West Haven. Officers Ardito, Laskowski, Pimer, Decicco, Towles and I were dispatched. Officer Laskowski and I went to the Stop & Shop [supermarket], Orange and Officers Ardito, Pimer, Decicco and Towles went to 79 Meadowbrook Court.

"Upon arrival I met the Orange [p]olice and the complainant, Holly Dilauro. Holly was visibly shaken and showed signs of physical abuse. Holly said that she had just been beaten, tied up and threatened by [the defendant], her [daughter's] father. Holly said that she was able to run away and call for help but she was afraid for her daughter who was left behind in the apartment. Holly asked us to please get her daughter. Holly said that [the defendant] was still possibly with her daughter. [The defendant] was described as a dark skin black male, 5' 5" tall, 155 lbs., short afro style hair. This information was radioed to the [o]fficers at Meadowbrook Court. Officer Ardito radioed that he had previously observed a male fitting that description inside the home. The home was now dark and the doors were locked. No one answered the door upon knocking. Dispatch was notified of the situation and a request was made to force entry. [Sergeant] McDonough radioed to get consent from the apartment owner. Holly signed a [c]onsent to search form and gave permission [to] force entry into the home.

"Officers Pimer, Ardito and Towles were able to make entry by breaking a window on the rear door. Office Decicco watched the front of the building as the [o]fficers made entry. The [o]fficers advised me that as they were going upstairs, [the defendant] opened the front second floor window in an attempt to leave. Officer Decicco advised that he yelled to [the defendant] stop and keep his hands out the window. [The defendant] was then taken into custody without further incident. The [five] month old baby . . . was unharmed an[d] taken into custody. [The defendant] was arrested and transported to police [h]eadquarters by Officer Towles. I then transported Holly back to 79 Meadowbrook Court, where she took possession of her daughter. As we arrived, an American Medical [R]esponse ambulance arrived to take Holly to the Yale-New Haven Hospital. Holly showed me the black belt, phone cord, power cord, other items that were used to tie her up and the bed where the incident happened. The belt and cords were taken and logged as evidence at headquarters.

"I was able to secure the premises by locking the rear outside door and front door. The Meadowbrook housing authority was advised of the broken window on the door.

"Sergeant Celentano and I then went to the Yale-New Haven Hospital to follow up on the investigation. Upon arrival, [Sergeant] Celentano took digital photos of red marks on Holly's throat and back and ligature marks

concluded, the state rested, as did the defense. The jury subsequently found that an enhanced penalty was in the public interest, and the court rendered judgment accordingly.

A

As a preliminary matter, we briefly address the state's contention that the defendant did not preserve his claim for appeal. It is axiomatic that issues not properly raised before the trial court ordinarily will not be considered on appeal. Practice Book § 60-5; see also *State* v. *Faison*, 112 Conn. App. 373, 379–80, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009). "The sine qua non of preservation is fair notice of the claim to the trial court. . . . [T]he essence of the preservation

---

around her wrists and ankles. The 3.5 computer disk was entered into evidence at headquarters. Holly then gave a sworn written statement. . . . Holly wrote that [the defendant] became angry when she repeatedly refused to let him borrow her car. She wrote that the more she refused the more enraged he became. He then started to punch her in the back and stomach and slap her in the head. She said she tried to fight him off which made him fight harder. Holly then bit [the defendant] in an attempt to get him off of her. She said she yelled for help. [The defendant] threatened to smash her in the head with a clothes iron. Holly said she tried to kick him away. [The defendant] then pulled the phone cord out of the wall and tied her legs. He took a black leather belt and a power cord and tied her wrists. Holly said that she was crying and [the defendant] took a rag, stuffed it in her mouth and tied a shirt around her head which covered her eyes and mouth. Holly said that he threw the box spring and mattress on top of her and yelled that he would be back at [four] o'clock to kill her.

"Holly said that [the defendant] left her and went downstairs. He then returned a short time later. He told her to stop crying and that she was actually crazy to believe that he would kill her. [The defendant] then ungagged and untied Holly. When he went downstairs, she said she followed. That's when she was able to escape and run to the Stop & Shop and call 911. In closing her statement, Holly said that she was in fear for her daughter and herself and that [the defendant] might kill her.

"Holly signed a medical release form to allow Yale-New Haven Hospital to release her medical records for this incident.

"At police headquarters . . . [the defendant] was held on a $50,000.00 bond. [The defendant] also had . . . three active warrants out of West Haven which were served on him."

requirement is that fair notice be given to the trial court of the party's view of the governing law . . . . A secondary purpose of the preservation requirement is to prevent the possibility that an appellee would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him." (Citations omitted; internal quotation marks omitted.) *State* v. *Favoccia*, 119 Conn. App. 1, 14–15, 986 A.2d 1081, cert. granted on other grounds, 295 Conn. 909, 989 A.2d 604 (2010).

The primary interest secured by the right to confrontation is the right of cross-examination. *Davis* v. *Alaska*, 415 U.S. 308, 315–16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Kirby* v. *United States*, 174 U.S. 47, 55, 19 S. Ct. 574, 43 L. Ed. 890 (1899); *State* v. *Lee*, 229 Conn. 60, 69, 640 A.2d 553 (1994). As the United States Supreme Court explained, the confrontation clause's "ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford* v. *Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In that seminal decision, the court declared that the sixth amendment prohibits the use of an out-of-court testimonial statement against a criminal defendant unless the witness is unavailable and the defendant was afforded a prior opportunity to cross-examine him.[8] Id., 50–53.

When the state moved to admit into evidence the police report, the defendant objected. The basis for his

---

[8] As noted by this court in *State* v. *Slater*, 98 Conn. App. 288, 292, 908 A.2d 1097 (2006), aff'd, 285 Conn. 162, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008), *Crawford* represented a sea change in sixth amendment jurisprudence.

objection was that "the author of this document is not going to be here for me to cross-examine. . . . I can't verify the veracity of the document. . . . [W]ithout an opportunity to cross-examine the author of this document, I have no basis of knowledge to know whether this information is accurate or not." The transcript plainly reflects that the distinct basis for counsel's objection was that he was unable to assess its reliability through the crucible of cross-examination.

It is true that defense counsel did not utter the words "Crawford" or "confrontation" in articulating his objection. The lack of such talismanic references alone does not render the objection infirm. Cf. *State* v. *Elson*, 125 Conn. App. 328, 353, 9 A.3d 731 (2010) (en banc) (eschewing notion that "the affirmative request requirement associated with *Golding* . . . necessarily includes the use of talismanic words or phrases"), cert. granted on other grounds, 300 Conn. 904, 12 A.3d 572 (2011); *State* v. *Janulawicz*, 95 Conn. App. 569, 576 n.6, 897 A.2d 689 (2006) ("Connecticut courts have refused to attach talismanic significance to the presence or absence of particular words or phrases"). Rather, we look to the purposes underlying the preservation requirement. See *State* v. *Favoccia*, supra, 119 Conn. App. 14–15. In the present case, it cannot be said that defense counsel failed to provide fair notice to the court of the distinct basis of his objection or that the state was "lured into a course of conduct at the trial which it might have altered" due to the precise objection stated. (Internal quotation marks omitted.) Id., 15. Both the court and opposing counsel were apprised that the objection was premised on the need to cross-examine the author of the police report as a means of testing its reliability. Accordingly, we conclude that the defendant preserved his claim for appellate review.

B

Turning our attention to the merits of the claim, we begin by noting that, under *Crawford* v. *Washington*,

supra, 541 U.S. 68, hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Accordingly, "the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature." *State* v. *Slater*, 285 Conn. 162, 170, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). That determination presents a question of law over which our review is plenary. Id.

In its appellate brief, the state focuses primarily on the double hearsay statements of the victim in the police report,[9] arguing that a portion thereof was nontestimonial, as it involved statements made "to enable police assistance to meet an ongoing emergency"; *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); and that the remainder was testimonial but harmless.[10] Yet the principal objection articulated by the defendant to the admission of the police report was that "the author of this document is not going to be here for me to cross-examine." Although it is true that the police report contains double hearsay statements of the victim, the testimonial hearsay to which counsel objected was the statement made by the

[9] Double hearsay, or hearsay within hearsay, "is admissible only if each part of the combined statements is independently admissible under a hearsay exception." (Internal quotation marks omitted.) *Skakel* v. *State*, 295 Conn. 447, 528, 991 A.2d 414 (2010).

[10] The police report also details Hancock's firsthand observations, including that the victim "showed signs of physical abuse," as well as various observations and experiences of other members of the West Haven and Orange police departments. As the United States Supreme Court has explained, "the text of the [Sixth] Amendment contemplates two classes of witnesses—those against the defendant and those in his favor." *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 2534, 174 L. Ed. 2d 314 (2009). In stating that the victim "showed signs of physical abuse," Hancock "provided testimony against"; id., 2533; the defendant.

officer who wrote the police report. Our analysis thus begins with a consideration of the propriety of that hearsay statement.

Although the court in *Crawford* expressly declined to "spell out a comprehensive definition of 'testimonial' "; *Crawford* v. *Washington,* supra, 541 U.S. 68; it did define three formulations of the "core class of testimonial statements"; id., 51; as follows: "[1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Citations omitted; internal quotation marks omitted.) Id., 51–52. The latter two formulations are implicated in the present case.

A police report is a quintessential example of an extrajudicial statement contained in a formalized testimonial material. It is signed by the attesting officer under penalty of law. It is prepared "with an eye toward prosecution"; *United States* v. *Palmer,* 463 F. Sup. 2d 551, 553 (E.D. Va. 2006); and it is inherently accusatory. See *People* v. *Rawlins,* 10 N.Y.3d 136, 157, 884 N.E.2d 1019, 855 N.Y.S.2d 20 (2008), cert. denied sub nom. *Meekins* v. *New York,* 557 U.S. 934, 129 S. Ct. 2856, 174 L. Ed. 2d 601 (2009). The primary purpose of a police report "is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* v. *Washington,* supra, 547 U.S. 822; cf. J. Ross, "After *Crawford* Double-Speak: 'Testimony' Does Not Mean Testimony and 'Witness' Does not Mean Witness," 97 J. Crim. L. &

Criminology 147, 154 (2006) (discussing practice of "trial by police report"). As one court held, a police report is "clearly testimonial hearsay." *United States* v. *Palmer*, supra, 553.

In *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), the United States Supreme Court implicitly agreed with that conclusion. The court clarified that although "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status . . . that is not the case if the regularly conducted business activity is the production of evidence for use at trial." (Citation omitted.) Id., 321. It continued: "Our decision in *Palmer* v. *Hoffman*, 318 U.S. [109, 63 S. Ct. 477, 87 L. Ed. 645] (1943), made that distinction clear. There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was *calculated for use essentially in the court,* not in the business. . . . [P]*olice reports generated by law enforcement officials . . . do not qualify as business or public records for precisely the same reason.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Melendez-Diaz* v. *Massachusetts,* supra, 321–22. The Supreme Court indicated that, like police reports, the affidavits reporting the results of the forensic analysis at issue were testimony against the petitioner, and the analysts who prepared them were subject to confrontation under the sixth amendment, irrespective of "[w]hether or not they qualify as business or official records" because the documents were "prepared specifically for use at petitioner's trial . . . ." Id., 324.

Moreover, the statement of a law enforcement official memorialized under oath in a police report is one "made under circumstances which would lead an objective witness reasonably to believe that the statement would

be available for use at a later trial . . . ." (Citation omitted; internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 541 U.S. 52; *State* v. *Slater*, supra, 285 Conn. 172–73. The state does not argue to the contrary in this appeal. Indeed, police reports routinely are submitted as evidence in criminal prosecutions throughout this state.

Although the state steadfastly has maintained that a portion of the testimony by the victim recounted in the police report was nontestimonial, as it was made "to enable police assistance to meet an ongoing emergency"; *Davis* v. *Washington*, supra, 547 U.S. 822;—a claim with which we agree—at no point in this appeal has the state argued that the police report itself is nontestimonial. At oral argument, the state submitted that the confrontation clause only is concerned with the underlying declarant's truthfulness in situations involving double hearsay, a claim it neither briefed nor provided any supporting authority for at argument. We disagree with the state's assertion. The confrontation clause is concerned with the reliability of "testimonial statements of witnesses absent from trial," such as the officer who prepared the police report, whom "the defendant has [not] had a prior opportunity to cross-examine." *Crawford* v. *Washington*, supra, 541 U.S. 59. As this court observed during argument, it is entirely plausible that an officer preparing a police report might make a mistake, if not embellish or lie, about certain facts contained therein. See, e.g., *State* v. *Ancona*, 270 Conn. 568, 617, 854 A.2d 718 (2004) (jury found defendant police officer drafted false police report), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

Furthermore, the state's position confounds the principle that, in cases involving double hearsay, each level of hearsay is subject to scrutiny under the confrontation clause. See, e.g., *United States* v. *McKinney*, 707 F.2d

381, 383 n.2 (9th Cir. 1983) ("[a]s the testimony . . . was double hearsay . . . [both] statements . . . need to be examined for [c]onfrontation [c]lause purposes"); *People* v. *Zapien*, 4 Cal. 4th 929, 955, 846 P.2d 704, 17 Cal. Rptr. 2d 122 (confrontation clause applies to "each segment" of double hearsay), cert. denied, 510 U.S. 919, 114 S. Ct. 315, 126 L. Ed. 2d 262 (1993); *State* v. *Brown*, 285 Kan. 261, 279, 173 P.3d 612 (2007) ("a [c]onfrontation [c]lause analysis must not ignore . . . multilevel hearsay issues"). As the Oregon Court of Appeals stated: "[I]t seems necessarily to follow from the United States Supreme Court's analysis in *Crawford*, that the rule of that case would apply to each level of hearsay. . . . [I]n order for *Crawford* to apply to a multilevel hearsay statement, the two prerequisites to that application— a testimonial statement and an unavailable declarant— must coincide on at least one level." *State* v. *Ennis*, 212 Or. App. 240, 255, 158 P.3d 510, review denied, 343 Or. 223, 168 P.3d 1154 (2007). We concur with that reasoning.

In light of the foregoing, we conclude that the police report in question is testimonial in nature. The United States Supreme Court has held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford* v. *Washington*, supra, 541 U.S. 68–69. The defendant was deprived of that right in the second portion of the part B proceeding when the court admitted the police report into evidence and Generoso's testimony thereon.

C

That determination does not end our inquiry. "It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . . The state bears the burden of proving that

the error is harmless beyond a reasonable doubt." (Citations omitted.) *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008). On our careful review of the record, we conclude that the state has met that burden.

Our Supreme Court has explained that "[w]hether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id.

In the part B proceeding, the state produced substantial evidence, apart from the police report, indicating that an enhanced penalty would best serve the public interest. Exhibit G, a report documenting the defendant's criminal history, was admitted into evidence without objection. In addition, Generoso offered ample testimony thereon. That evidence reveals the following. At age seventeen, the defendant was arrested for an incident that occurred on March 4, 1998. He thereafter was convicted of criminal trespass in the second degree in violation of General Statutes § 53a-108 and sentenced to ninety days incarceration. Approximately six months later, the defendant was arrested and later convicted of disorderly conduct in violation of General Statutes § 53a-182.[11] The defendant was sentenced to fifteen days incarceration on that conviction.

---

[11] The state also charged the defendant with one count of interfering with an officer in violation of General Statutes § 53a-167a, which the state nolled.

On October 11, 2001, the defendant was arrested for a third time and charged with assault of a pregnant person in the third degree in violation of § 53a-61a and breach of the peace in the second degree in violation of General Statutes § 53a-181. He subsequently was charged with two counts of failure to appear in the second degree in violation of General Statutes § 53a-173. The defendant ultimately was convicted of assault of a pregnant person and sentenced to a term of one year incarceration for that offense; he also was convicted on both failure to appear counts, for which he received concurrent sentences of one year incarceration.

May, 2002, was a particularly eventful month in the defendant's criminal history. He was arrested following a March 31, 2002 incident for which he was charged with criminal violation of a protective order in violation of § 53a-110b. The defendant's second arrest of that month—and fifth overall—pertained to the May 28, 2002 incident that prompted the police report. At that time, the defendant was charged with unlawful restraint in the first degree in violation of § 53a-95.[12] The defendant thereafter was convicted of both criminal violation of a protective order and unlawful restraint in the first degree. On December 18, 2002, the court sentenced the defendant to a term of five years incarceration, execution suspended after eighteen months, with three years probation on the unlawful restraint conviction. It further sentenced him to a term of one year incarceration, suspended, consecutive to the unlawful restraint

[12] The state also charged the defendant with burglary in the second degree in violation of General Statutes § 53a-102, criminal mischief in the third degree in violation of General Statutes § 53a-117, threatening in the second degree in violation of General Statutes § 53a-62, disorderly conduct in violation of § 53a-182, threatening in the second degree in violation of § 53a-62, assault in the third degree in violation of § 53a-61, interfering with an officer in violation of General Statutes § 53a-167a and two counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63 stemming from the March 31 and May 28, 2002 incidents, which charges the state later nolled.

sentence, with three years of probation on the conviction of criminal violation of a protective order.[13] The defendant's sixth arrest occurred on October 27, 2006, and underlies the present appeal.

Apart from that evidence of the defendant's numerous arrests, convictions and criminal sentences, the jury also had before it evidence of the defendant's disciplinary history while incarcerated. Specifically, it learned that the defendant was subject to seven days of punitive segregation for fighting in February, 1997. Similarly, in January, 1999, the defendant received twenty-two days of punitive segregation and the loss of other privileges for interfering with the safety and security of the facility. In September, 2002, the defendant received thirty days of punitive segregation and the loss of other privileges for disobeying a direct order and for possessing contraband. One week after his December 18, 2002 sentencing for the various offenses detailed above, the defendant was confined to quarters for ten days for being out of place. In April, 2003, he received thirteen days of punitive segregation and the loss of other privileges for, inter alia, causing a disruption and disobeying a direct order. In July, 2003, he received seven days of punitive segregation and the loss of other privileges for fighting and disobeying a direct order. In November, 2003, the defendant received fifteen days of punitive segregation and the loss of other privileges for interfering with the safety and security of the facility.

Also introduced without objection was evidence of the defendant's June 7, 2007 conviction on two counts of violation of probation, for which he was sentenced to an effective term of one year incarceration. That history is evidence on which the jury could rely in

[13] The court at that time also ordered that the defendant's one year sentences pertaining to his convictions for assault of a pregnant person and failure to appear stemming from his third arrest on October 11, 2001, were to run concurrent to the sentence for his conviction of unlawful restraint in the first degree.

reaching its determination as to whether an enhanced penalty would best serve the public interest.

Although we acknowledge that the officer's statement in the police report depicts, at times in graphic detail, the defendant's assault on the victim, Holly Dilauro, we do not believe that, under the facts of this case, its admission into evidence likely influenced the judgment of the jury. The jury already had before it evidence that, as to that incident, the defendant was charged with and convicted of the crime of unlawful restraint in the first degree. More significantly, the jury had before it evidence that the defendant on a prior occasion had been convicted of criminal violation of a protective order. Generoso testified before the jury that protective orders are issued "where domestic violence occurs" and that they involve "an order by the judge that [the defendant is] not to do certain things to the victim." Thus, the jury was aware that the defendant previously had perpetrated an act of domestic violence and that he subsequently violated the resulting protective order. Equally significant is the fact that the jury also had before it evidence that the defendant, in yet another separate incident, was charged with and convicted of assaulting a pregnant person in violation of § 53a-61a. Accordingly, apart from the incident documented in the police report, the jury had before it evidence of multiple acts of domestic violence on the part of the defendant against multiple female victims, one of whom at the time was pregnant. Of course, the same jury earlier had found that the defendant had assaulted Hutchinson, the mother of his infant daughter, when he struck her in the face on October 27, 2006—itself a domestic violence crime.[14] The defendant's violent propensity further is evidenced by the repeated disciplinary sanctions he received while incarcerated, which

[14] We note that the United States Supreme Court, in *Davis* v. *Washington*, supra, 547 U.S. 832, addressed the claim that "the nature of the offenses charged in these two cases—domestic violence—requires greater flexibility

the state presented in documentary and testimonial form.

When considered within the entirety of the evidence submitted during the second phase of the part B proceeding, the police report is but one tile in the mosaic. The conduct of the defendant described therein is similar in several respects to the other criminal activity documented by the state in that proceeding. Because the jury had before it a certified copy of the defendant's conviction for unlawful restraint in the first degree in violation of § 53a-95 stemming from the May 28, 2002 incident, the police report in certain respects was cumulative evidence. Given the overwhelming strength of the state's case against him and the fact that the defendant's conviction for unlawful restraint already was in evidence, the police report was not important to the state's case. We have little doubt the jury would have reached the same result had the police report not been admitted into evidence. In light of the foregoing, we conclude that the state has met its burden in establishing that the error in this case is harmless beyond a reasonable doubt. See *State* v. *Peeler*, 271 Conn. 338, 389, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

The judgment is affirmed.

In this opinion the other judges concurred.

in the use of testimonial evidence." It stated: "This particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. . . . [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds. . . . That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (Citations omitted; internal quotation marks omitted.) Id., 832–33; see generally R. Talbott, "What Remains of the 'Forfeited' Right to Confrontation? Restoring Sixth Amendment Values to the Forfeiture-by-Wrongdoing Rule

in Light of *Crawford* v. *Washington* and *Giles* v. *California*," 85 N.Y.U. L. Rev. 1291 (2010).