******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JAYSAN YOUNG
(AC 36181)

Gruendel, Alvord and Norcott, Js.

*Argued January 20—officially released June 2, 2015*

(Appeal from Superior Court, judicial district of Hartford, Suarez, J.)

*Damian K. Gunningsmith*, assigned counsel, with whom, on the brief, was *John L. Cordani, Jr.*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja* and *Chris A. Pelosi*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Jaysan Young, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-49 (a) (2), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-48, risk of injury to a child in violation of General Statutes § 53-21 (a) (1), carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217c. On appeal, the defendant claims that (1) the state produced insufficient evidence for the jury to find him guilty of all charges and (2) the trial court improperly permitted an expert witness to testify that his findings had been confirmed by his supervisor. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. At approximately 3 p.m. on November 21, 2011, Ana Soto and her nephew, Tyvan Gooden, were outside of Soto's home on Enfield Street in Hartford when Soto observed two men in a driveway down the street, both holding guns. Soto saw one of the two men shooting bullets across the street. Gooden saw both men firing their weapons. Soto hid behind a car as the bullets flew across the street, while Gooden ran up the street away from the two men. From behind the car, Soto observed the men, whom she described as two black men, run toward the back of an apartment building on Enfield Street.

Shortly thereafter, Officer Benjamin Espinosa of the Hartford Police Department, who was on duty as a school resource officer at the Thirman Milner School, received a radio call from a school security guard that shots had been fired in the area of Enfield Street, a block away from the school. After receiving the radio call, Espinosa exited the school building and stood by the front entrance on Magnolia Street, which runs parallel to Enfield Street. Espinosa was notified via radio by the Hartford Police Department's dispatch operator that there were two possible suspects in the Enfield Street shooting.

After receiving the radio call that shots had been fired, it took "[l]ess than a minute" for Espinosa to exit the school building and reach the front entrance on Magnolia Street. He stood by the front entrance of the school for "about a minute" more before he observed an individual by the corner of a building across the street. The individual then began to walk in the direction of the school, with another individual following right behind him. Espinosa radioed the police dispatch operator to report that he had seen two individuals who might be the suspects. These two individuals were later identified as the defendant and Rashaad Bunkley.

Espinosa observed the defendant and Bunkley walk through the school's courtyard toward a part of the school that was under construction, where a security officer confronted them and denied them access to the construction zone. The defendant and Bunkley then walked in the opposite direction and entered the school's cafeteria, where approximately sixty to eighty children were participating in the school's after-school program.

Espinosa confronted the defendant and Bunkley while they were standing in the cafeteria. One of them told Espinosa that they were at the school to pick up a sibling. Espinosa then instructed the defendant and Bunkley to sit down. Another Hartford police officer entered the cafeteria, and the defendant and Bunkley were handcuffed and detained. They were patted down and no weapons were discovered. While they were detained, Espinosa observed blood on the defendant's right hand and pants. The defendant and Bunkley were then removed from the cafeteria and taken to an area in front of the school building.

Police detectives brought Soto over to the school to see if she could identify the defendant and Bunkley as the perpetrators of the shooting. She was not able to identify them as the two men she had seen on Enfield Street. Gooden testified at trial that the defendant was not one of the perpetrators of the shooting.

During their investigation into the shooting, the police found nine spent shell casings in front of a house on Enfield Street. Detective Gregory Gorr of the Hartford Police Department's crime scene division identified the casings as .40 caliber casings from a semiautomatic weapon. The police also discovered two weapons and a black mask underneath the porch of a building on Magnolia Street. The building was near a path that connected Enfield Street to Magnolia Street. Gorr identified one of the weapons as a semiautomatic pistol and the other as a .38 caliber revolver, which contained five spent shell casings. Blood was found on the grip and back strap of the semiautomatic pistol. Gorr observed small cuts on both of the defendant's hands and used cotton tip swabs to take a sample of the defendant's blood from the cuts. He also collected the defendant's bloodstained pants. Additionally, Gorr conducted gunshot residue tests, known as GSR kits, on both the defendant and Bunkley.

The state forensics laboratory tested and analyzed the physical evidence collected by the police. Douglas Fox, a firearms and tool mark examiner, examined and tested the semiautomatic pistol and determined that it was operable. He also determined that the nine spent shell casings found on Enfield Street were all fired from the pistol. Karen Lamy, another employee at the state forensics laboratory, swabbed the pistol for potential

DNA samples. She took five swabs—one from a blood-stain on the bottom of the grip area of the pistol, a second from a bloodstain higher up on the grip area, a third from the trigger area, a fourth from the slide area, and a fifth from the exterior of the magazine. Daniel Renstrom, a forensics science examiner at the state forensics laboratory, analyzed the swabs from the pistol and compared them to the defendant's DNA. He determined that the defendant was a contributor to the DNA mixture from the bloodstain on the bottom of the grip area of the pistol and that the defendant could not be eliminated as a contributor to the DNA from the bloodstain higher up on the grip area. He also found that the defendant could not be eliminated as a contributor to the DNA mixture from the slide area of the pistol or from the exterior of the magazine. The defendant was eliminated as a contributor to the DNA from the trigger area, signifying that the defendant's DNA was either not present on the trigger or not present to a detectable level. Additionally, Fung Kwok, a forensics science examiner at the state forensics laboratory, analyzed the GSR kit that had been conducted on the defendant. The results of Kwok's analysis were inconclusive—he was unable to draw any scientific conclusion as to whether the defendant had fired a gun on the day of the Enfield Street shooting.

The defendant was charged with five offenses: attempt to commit assault in the first degree, conspiracy to commit assault in the first degree, risk of injury to a child, carrying a pistol without a permit, and criminal possession of a firearm. The defendant was tried before a jury and found guilty on all five charges. The court, *Suarez*, *J.*, imposed a total effective sentence of forty-one years imprisonment. This appeal followed.

I

The defendant first claims that the state produced insufficient evidence for the jury to find him guilty of all charges. He raises three separate sufficiency arguments. First, the defendant argues that there was insufficient evidence to support his conviction of conspiracy to commit assault in the first degree because the state failed to present any evidence that the defendant and Bunkley had a prearranged plan to commit the assault. Second, he argues that there was insufficient evidence to support his conviction of risk of injury to a child because his conduct on the day of the Enfield Street shooting never created a situation that made physical injury to a child likely or probable. Finally, the defendant argues that there was insufficient evidence on the element of identity to sustain his conviction on all charges because the state failed to prove that the defendant's DNA could only have been placed on the pistol at the time the crimes were perpetrated. We are not persuaded by the defendant's arguments.

We now turn to the applicable standard of review.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

A

The defendant first argues that there was insufficient evidence to support his conviction of conspiracy to commit assault in the first degree because the state failed to present any evidence that the defendant and Bunkley had a prearranged plan to commit the assault. The defendant contends that "the only evidence that

the state could point to as supporting an inference of agreement is that the defendant and the other shooter fired their guns simultaneously . . . in the direction of [Gooden and Soto]," and that "[t]his spontaneous shooting alone is insufficient to support an inference of intent to enter an agreement beyond a reasonable doubt." The defendant also argues that the fact that he "was found with Bunkley in the school after the shooting cannot fill the evidentiary void in the state's case" because "[t]he state offered no proof tying Bunkley to the shooting" and, "even if the jury could infer that Bunkley was the second shooter, walking away from the scene of a crime together does not show a *preexisting* conspiracy to commit a crime . . . ." (Emphasis in original.) In response, the state argues that "the evidence of the defendant's and Bunkley's concerted actions before, during, and after the shootings established the existence of an agreement." We agree with the state.

"To establish the crime of conspiracy under § 53a-48 of the General Statutes, it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators." (Internal quotation marks omitted.) *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992). "The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 462, 886 A.2d 777 (2005).

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to establish that the defendant conspired with Bunkley to commit the Enfield Street shooting. The defendant and Bunkley arrived at the scene of the shooting together and fired their weapons simultaneously in the same direction. They continued to act in concert after the shooting, fleeing the scene, disposing of their weapons beneath the porch of a nearby building, and attempting to hide in the school. From these facts, the jury reasonably could conclude beyond a reasonable doubt that the defendant and Bunkley entered into an agreement to commit assault in the first degree. See *State* v. *Taft*, 306 Conn. 749, 760, 51 A.3d 988 (2012)

(concluding there was sufficient evidence of conspiracy when defendant and coconspirators were "armed aggressors, who acted in concert to pursue the victim"); *State* v. *Lewis*, 220 Conn. 602, 607–608, 600 A.2d 1330 (1991) (determining there was sufficient evidence of conspiracy when defendant and coconspirator approached victim, shot victim, and fled from scene together); *State* v. *Rosado*, 134 Conn. App. 505, 511–12, 39 A.3d 1156 (holding there was sufficient evidence of conspiracy when defendant was present at scene of shooting, fled from scene, and accompanied shooters while they hid their weapons), cert. denied, 305 Conn. 905, 44 A.3d 181 (2012).

B

We next turn to the defendant's argument that there was insufficient evidence to support his conviction of risk of injury to a child because his conduct on the day of the Enfield Street shooting never created a situation that made physical injury to a child likely or probable. The state contends that the defendant's conviction of risk of injury to a child may be sustained by the evidence that the defendant and Bunkley attempted to hide from the police in a school cafeteria holding sixty to eighty children.[1] The defendant argues in response that the state failed to present sufficient evidence to support his conviction of risk of injury to a child because there was no violent altercation involving law enforcement in close proximity to any of the children present in the school. We agree with the state.

Section 53-21 (a) (1) provides that a person is guilty of risk of injury to a child if such person "wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . ." "[T]he charge of risk of injury to a child does not require proof of an actual injury, but only that the actions of the defendant exposed the victim to a situation that potentially could impair his health." *State* v. *Peters*, 40 Conn. App. 805, 828–29, 673 A.2d 1158, cert. denied, 237 Conn. 925, 677 A.2d 949 (1996). "Lack of an actual injury to either the physical health or morals of the victim is irrelevant . . . actual injury is not an element of the offense. . . . [T]he creation of a prohibited situation is sufficient." (Citations omitted; internal quotation marks omitted.) *State* v. *Sullivan*, 11 Conn. App. 80, 98, 525 A.2d 1353 (1987).

The defendant argues that the evidence was insufficient to prove beyond a reasonable doubt that his actions in hiding in the school cafeteria created a situation that made injury to a child likely or probable. He emphasizes that he did not engage in a violent altercation with the police in the presence of the children in

the cafeteria. Instead, he "was simply standing near a table in the cafeteria, unarmed, and chose to enter police custody peacefully."

The state, on the other hand, argues that "the defendant's act of entering the cafeteria with Bunkley while fleeing from the scene of a shooting and attempting to hide there created a situation likely to endanger the life or limb of the children present. It is axiomatic that evading or fleeing from police can provoke a response by law enforcement that creates a risk of injury to innocent bystanders. . . . By wilfully fleeing into the grade school, the defendant created a situation in which the children there were at risk of being injured in the course of a vigorous police response. . . . That the defendant ultimately submitted to detention and arrest without a struggle or violence does not diminish the risk that he created when he first entered the school cafeteria while in immediate flight from the scene of a violent crime." (Citations omitted; footnote omitted.)

The defendant responds that the state's theory is "somewhat attenuated because it suggests that the risk that [he] must have disregarded arose from the conduct of third persons, i.e., the police, not from the defendant's actions in the presence of the children. . . . Because this theory relies on the police response to [the defendant's] actions, a proper analysis should rely on facts that were reasonably available to officers at the time. Thus, [this court] should reject any attempt by the state to argue that the ex post finding of guilt related to the shooting, based on additional facts not reasonably available at the time, bolsters the likelihood of risk." We are not persuaded by the defendant's arguments.

Our Supreme Court's decision in *Crawford* v. *Commissioner of Correction*, 285 Conn. 585, 599–601, 940 A.2d 789 (2008), indicates that a criminal defendant may be found guilty of risk of injury to a child if he initiates a police pursuit and that pursuit creates a risk of injury to a child. The specific actions of law enforcement personnel during the pursuit—whether they acted negligently or responsibly—are irrelevant in determining the defendant's guilt. In *Crawford*, our Supreme Court rejected the petitioner's argument that the habeas court had improperly precluded testimony that police officers had acted negligently when they pursued the petitioner in a high speed vehicular chase after he attempted to evade arrest. Id. The chase ended when the petitioner's vehicle collided with another vehicle on the road. Id., 587. Following the vehicular pursuit, the petitioner was charged with and convicted of, inter alia, risk of injury to a child, as there had been two small children in the vehicle in which he had attempted to flee from the police. Id. On appeal, the petitioner argued that the habeas court improperly precluded the testimony concerning the police officers' negligence

because "it would have supported the petitioner's argument that the accident might have been less harmful, or avoided altogether, if the police had followed procedures and activated the cruiser's siren and flashing lights during the pursuit, thereby warning the other vehicle's driver of the approaching chase and giving him time to pull over." Id., 600–601.

Our Supreme Court rejected the petitioner's argument, noting that the precluded testimony "had no relevance to the petitioner's culpability in the criminal proceeding. Whether the police may have been negligent in conducting the vehicular pursuit had no bearing on the fact that the petitioner initiated the pursuit by fleeing in his vehicle when the Waterbury police attempted to serve him with a criminal warrant for his arrest. The petitioner chose the route taken for the pursuit, the speed at which the pursuit was conducted and the action ultimately responsible for the collision, namely, an ill-advised attempt to drive between a construction crew and another vehicle when there was no room on the roadway to do so." Id., 603.

Additionally, the state cites *State* v. *Holley*, 144 Conn. App. 558, 564, 72 A.3d 1279, cert. denied, 310 Conn. 946, 80 A.3d 907 (2013), to support its argument that there was sufficient evidence that the defendant's conduct in the present case created a risk of injury to a child. In *Holley*, the jury found the defendant guilty of risk of injury to a child after it heard evidence that he had engaged in a " 'violent struggle' " with five law enforcement personnel in close proximity to a child. Id. On appeal, this court affirmed the defendant's conviction, stating that "[i]n light of this evidence, and on the basis of its common knowledge and experience, the jury reasonably could have inferred that engaging five police officers in a physical altercation in close proximity to a child would create a situation likely to endanger that child's life or limb." Id.

The defendant argues that *Holley* is distinguishable from the present case. He emphasizes that, unlike the defendant in *Holley*, he did not engage in a violent altercation with the police in the presence of the children in the school cafeteria. Rather, he surrendered to the police peacefully. We are not persuaded that the lack of a physical altercation with police necessarily compels the conclusion that the defendant's actions did not create a risk of injury to a child.

The jury reasonably could have concluded from the evidence presented that the defendant and Bunkley committed the shooting on Enfield Street and then attempted to hide from the police in the school cafeteria, which was then occupied by sixty to eighty children. Detective Anthony Pia of the Hartford Police Department testified about the speed and vigor of the police response to the shooting. Pia stated that "[a]s soon as we heard shots fired come in, it was pretty much our

standard operation that we all ran out of the office and jumped in our cars and headed to wherever it was." He also testified that when he entered the school with other officers, the front door was "being held open by a security guard" and "[w]e were running at full speed with badge[s] exposed." The police did not discover that the defendant and Bunkley had disposed of their weapons until after they had been taken into custody and searched. As such, the officers who responded to the shooting knew only that the perpetrators were in a school full of children and that they were potentially armed. We conclude that, in light of this evidence, and on the basis of its common knowledge and experience, the jury reasonably could have inferred that the defendant created a situation likely to endanger the life or limb of a child when he prompted a vigorous police response by committing a shooting in a residential neighborhood and then attempted to hide from the police, who had reason to believe he was armed, in a school cafeteria where children were present. We further conclude, therefore, that there was sufficient evidence to sustain the defendant's conviction of risk of injury to a child.

## C

We now address the defendant's argument that there was insufficient evidence on the element of identity to sustain his conviction on all charges because the state failed to prove that his DNA could have been placed on the pistol only at the time the crimes were perpetrated. In response, the state argues that it was not required to establish that the defendant's DNA could have been placed on the pistol only at the time the crimes were perpetrated because, in addition to the DNA evidence, there was extensive circumstantial evidence linking him to the shooting. We again agree with the state.

The defendant relies on *State* v. *Payne*, 186 Conn. 179, 184, 440 A.2d 280 (1982), to support his position. In *Payne*, our Supreme Court reiterated the rule that "a conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could only have been impressed at the time the crime was perpetrated." Id., 182. The defendant argues that the fingerprint rule articulated in *Payne* should be applied to DNA evidence because DNA identification is analogous to fingerprint identification. We need not determine whether the *Payne* fingerprint rule should apply to DNA evidence because we conclude that, in the present case, the state's case did not rest on DNA evidence alone.

The state presented abundant circumstantial evidence that the defendant was one of the shooters on Enfield Street. Enfield Street and Magnolia Street run parallel to each other. From the front entrance of the Thirman Milner School on Magnolia Street, Officer

Espinosa observed the defendant behind the corner of another building on Magnolia Street only a few minutes after the shooting on Enfield Street. He then observed the defendant and Bunkley attempt to enter a part of the school under construction and then enter the school cafeteria. Detective Gorr observed that the defendant had small cuts on his hands and that his pants were bloodstained. The police found the pistol and the revolver that had been used in the shooting beneath the porch of a building located near a path connecting Enfield Street and Magnolia Street. The pistol had blood on it, and the defendant's DNA was later determined to be present on that weapon.

"It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Calabrese*, supra, 279 Conn. 402–403. The jury reasonably could have inferred from the circumstantial evidence presented by the state that the defendant and Bunkley committed the shooting on Enfield Street, fled in the direction of the school on Magnolia Street, disposed of their weapons along the way, and then attempted to hide from the police in the school cafeteria. The jury also could have inferred, in light of the defendant's proximity to the scene of the shooting and the short amount of time between the shooting and the defendant's surrender to the police, that the blood on the pistol had come from the cuts on the defendant's hands. Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the state's case did not rest on the DNA evidence alone and that the cumulative impact of the circumstantial evidence, combined with the DNA evidence, was sufficient for the jury to find beyond a reasonable doubt that the defendant was one of the perpetrators of the Enfield Street shooting.

II

The defendant's final claim is that the court improperly permitted an expert witness to testify that his findings had been confirmed by his supervisor. The defendant argues that the expert witness' testimony was inadmissible hearsay and that the admission was harmful. The defendant also argues that the court, in allowing the expert witness to testify that his supervisor confirmed his findings, violated the defendant's right under the confrontation clause to confront and cross-examine the supervisor. We are not persuaded by either of the defendant's arguments.

The following additional facts are necessary for our review of this claim. At trial, Fox, a firearms and tool mark examiner at the state forensics laboratory, testified for the state. Fox testified that he tested the operability of the pistol used by the defendant in the Enfield Street shooting by test-firing it. The pistol was operable and ejected a spent cartridge case, which Fox compared

to the nine spent casings found by the police on Enfield Street. Specifically, he compared the breach marks on the test cartridge case to the breach marks on the casings from Enfield Street. Fox explained that breach marks are horizontal lines on a spent cartridge case that are "created from the pressure that's built up in a pistol when it strikes the brass cartridge, makes contact with the harder metal of the pistol." Fox determined that there was "sufficient agreement" between the breach marks on the test cartridge and the breach marks on the spent casings from Enfield Street for him to conclude that all nine Enfield Street casings had been fired from the pistol used by the defendant during the shooting. Fox then wrote two reports, one on the operability of the pistol, and the other on the comparison work he conducted on the casings.

After Fox testified about the conclusions he reached in his reports, the prosecutor asked him if his results had been "confirmed by another firearms' analyst." Defense counsel objected on the ground that Fox's answer would constitute inadmissible hearsay. The court overruled the objection, stating: "He is not quite there yet, but let's see where he goes. *Overruled at this time*." (Emphasis added.) Fox then answered that his findings had been confirmed by his supervisor, James Stephenson, who had "equal or higher level . . . training . . . ."

On cross-examination, defense counsel probed Fox about Stephenson's confirmation of his findings:

"[Defense Counsel]: [W]ho is James [Stephenson]?

"[Fox]: He is my supervisor at the forensic laboratory.

"[Defense Counsel]: . . . And he signed those two reports as a review, correct?

"[Fox]: Yes.

"[Defense Counsel]: And you signed them as an examiner?

"[Fox]: Correct."

Fox also testified, in response to questions on cross-examination, that Stephenson's confirmation was necessary for his report. Fox stated: "As long as I feel it's sufficient agreement and I have someone of equal training or higher training than myself agreeing with my area of sufficient agreement, it's reported as a[n] identification."

## A

The defendant first argues that Fox's testimony that Stephenson confirmed his findings was inadmissible hearsay and that the admission of the testimony was harmful. The state argues that Fox's testimony was admissible and that, even if it was inadmissible, any error was harmless. We agree with the state that any error in admitting Fox's testimony was harmless.

We now turn to the applicable standard of review. "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Citation omitted; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 596–97, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) Id., 592.

Even if we assume, without deciding, that the court erred in permitting Fox to testify that Stephenson confirmed his findings, we conclude that the error was harmless. Although defense counsel initially objected to the prosecutor's question of whether the expert's results had been confirmed by his supervisor, defense counsel declined the opportunity, extended by the court, to object when the prosecutor offered Fox's report as a full exhibit. The court admitted the report into evidence as a business record with no objections. Once the report was admitted, the jury was able to view it and would have been able to see from the face of the report that Stephenson had signed off on Fox's results as a reviewer. Fox's testimony that Stephenson confirmed his findings was cumulative to his report, which the jury had full access to, and therefore harmless.

The defendant argues that Fox's testimony was not cumulative to his report and that it was not harmless because Stephenson's confirmation was critical to the final opinion Fox arrived at and testified about in court. The defendant contends that, under industry standards, Fox could not have opined that there was a match between the pistol and the cartridge casings without confirmation from Stephenson. The defendant appears to argue that Fox's testimony that Stephenson confirmed his findings was not harmless because Fox's testimony about the substance of his findings would not have been admissible unless he also testified about Stephenson's confirmation. The defendant has offered no authority to support this argument and did not object at trial to Fox's testimony on this ground. The defendant objected only to the question of whether Fox's findings

were confirmed by his supervisor. Assuming, without deciding, that the court erred in permitting Fox to testify that Stephenson confirmed his findings, we conclude that the error was harmless.

B

We next turn to the defendant's argument that Fox's testimony that Stephenson confirmed his findings violated the defendant's right under the confrontation clause to confront and cross-examine Stephenson. The defendant concedes that his confrontation clause claim is unpreserved but requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state argues that the defendant's claim cannot be reviewed under *Golding* because the record is inadequate for review. We agree with the state.

Under *Golding*, an unpreserved constitutional claim may be reviewed on appeal if "*all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) Id.

In the present case, the record is not adequate to review the defendant's confrontation clause claim. "In *Crawford* v. *Washington*, [541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the [United States] Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. . . . In the wake of *Crawford*, therefore, the preliminary step in any confrontation clause analysis is the determination of whether the subject statements are testimonial hearsay." (Citations omitted; internal quotation marks omitted.) *State* v. *Buckland*, 313 Conn. 205, 212–13, 96 A.3d 1163 (2014), cert. denied, U.S. , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015).

Our Supreme Court has noted that, although "there is no comprehensive definition of testimonial, it is clear that much of the [United States] Supreme Court's and our own jurisprudence applying *Crawford* largely has focused on the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes." (Internal

quotation marks omitted.) *State* v. *Slater*, 285 Conn. 162, 172, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). "In *Melendez-Diaz* v. *Massachusetts*, [557 U.S. 305, 308, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)], the [United States Supreme Court] held that certificates signed and sworn to by state forensics analysts, which set forth the laboratory results of the drug tests of those analysts and which were admitted into evidence in lieu of live testimony from the analysts themselves, were testimonial within the meaning of *Crawford*. In so concluding, the court reasoned that: (1) the certificates clearly were a sworn and solemn declaration by the analysts as to the truth of the facts asserted; (2) under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance; and (3) the court could safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves." (Internal quotation marks omitted.) *State* v. *Buckland*, supra, 313 Conn. 213.

In *Williams* v. *Illinois*, U.S. , 132 S. Ct. 2221, 2227, 183 L. Ed. 2d 89 (2012), the United States Supreme Court considered whether a report from Cellmark Diagnostics Laboratory concerning the creation of a DNA profile was testimonial. Cellmark created the DNA profile from a vaginal swab taken from a rape victim. Id. The Illinois State Police laboratory compared a DNA profile it created from a sample of the defendant's blood to the DNA profile created by Cellmark, and the comparison resulted in a positive match. Id., 2229. At trial, an expert witness from the Illinois State Police laboratory referred to Cellmark's report during her testimony when she stated that there was a match between the DNA profile created by the Illinois State Police laboratory and the DNA profile created by Cellmark. Id., 2229–32. The court concluded that, even if the Cellmark report had been introduced "for its truth," the defendant's rights under the confrontation clause would not have been violated. Id., 2242.

The court noted that, in every case in which it had found a confrontation clause violation under the *Crawford* test, "the statement at issue had the primary purpose of accusing a targeted individual." Id., 2243. The Cellmark report, on the other hand, was not created "to accuse [the defendant] or to create evidence for use at trial." Id. The vaginal swab was sent to Cellmark "to catch a dangerous rapist who was still at large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate [the defendant]—or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no prospect

of fabrication and no incentive to produce anything other than a scientifically sound and reliable profile." (Internal quotation marks omitted.) Id., 2243–44.

From the record before us in the present case, we cannot determine whether Fox's testimony that Stephenson confirmed his findings was testimonial hearsay. The record reveals that Stephenson "confirmed" Fox's findings and that Stephenson signed Fox's report comparing the cartridge cases "as a review." Fox also testified that Stephenson's confirmation was required in order for Fox's findings to be "reported as [an] identification." Fox's report, signed by Stephenson, indicates that the pistol and cartridge cases were submitted to the laboratory by the Hartford Police Department. The report does not reference the defendant or any specific police investigation.

The record does not reveal how or to what extent Stephenson reviewed and confirmed Fox's findings. The record also gives no indication of whether Stephenson knew that his confirmation would be used for prosecutorial purposes. His confirmation could have been required for prosecutorial purposes, for the forensics laboratory's internal procedures, or for some other reason. Nor is it clear whether Stephenson was aware that the report he reviewed and signed would be used as evidence specifically against the defendant. Although Fox's report does not reference the defendant or an ongoing criminal investigation, the record does not clarify whether Stephenson's knowledge was limited to the contents of the report or whether he had additional information about the report's purpose. Unlike the United States Supreme Court in *Melendez-Diaz* and *Williams*, we cannot determine, without engaging in speculation, whether Stephenson's confirmation of Fox's findings was given for prosecutorial purposes or if Stephenson had a reasonable expectation that his confirmation would later be used as evidence against the defendant. We conclude that the record before us is inadequate to allow us to decide whether Fox's testimony that Stephenson confirmed his findings was testimonial hearsay, and we therefore decline to review the defendant's confrontation clause claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The state also argues, in the alternative, that it presented sufficient evidence to sustain the defendant's conviction of risk of injury to a child through Gooden's testimony on cross-examination that there were "kids" on Enfield Street at the time of the shooting. Because we agree that the evidence concerning the defendant's attempt to hide from the police in a school cafeteria full of children was sufficient to sustain his conviction, we do not address the state's alternate ground.